HARLAN BOURBON AND WINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10733.    Promulgated January 30, 1950.

*H. H. Mathis, Esq.*, for the petitioner.
*R. E. Maiden, Esq.*, and *George LeBlanc, Esq.*, for the respondent.

98

## OPINION.

ARNOLD, *Judge*: Petitioner seeks relief under section 722 (b) (2) of the Code [1] as to excess profits taxes for 1941, 1942, and 1943, alleging

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. ·

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

that its excess profits tax liability for those years is excessive and discriminatory and its average base period net income originally returned for the base period years is an inadequate standard of normal earnings because the business of petitioner was depressed in the base period on account of a depression in the industry of which petitioner is a member resulting from a temporary economic event unusual in the case of that industry, namely, a ruinous trade war among wholesale liquor dealers which began in 1937 and was not ended until after March 1940.

To prevail under the issues here the petitioner must show that its average base period net income is an inadequate standard of normal earnings, that this was because petitioner's business was depressed in the base period, and that the cause of this depression was a temporary economic event unusual in the petitioner's industry, and must establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.

Petitioner has not shown that its average base period net income, as computed with the benefit of section 713 (e), is "an inadequate standard of normal earnings." This term refers to a standard which falls below that established over a reasonable period of time and under normal conditions. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220. The early years of the revived liquor industry in Kentucky was a period of large demand and small supply. Profits were large in relation to sales and to net worth in 1934, 1935, and 1936. By June 30, 1937, the stocks of whiskey in bonded warehouses had reached a level which was not greatly increased in the next three years. Supply was overtaking the demand. Prices fell, as was inevitable. The easy profits of the early years diminished. The statistics shown in our findings of fact indicate a decline in the last two years of the base period in the relation of net income to net sales in the combined experience of five of petitioner's competitors named by it in its application for relief under section 722. Also, they show a decline in such years in the ratio of net income to net worth and of net income to net sales in the combined experience of the four largest corporations in the liquor and distilled spirits industry and in the experience of all listed corporations in the industry. Petitioner's sales were fairly constant in dollar volume through the base period with some falling off in 1938, and with a substantial recovery in 1939. Petitioner's gross profits were fairly level in 1935, 1936, and 1937, and fell lower in 1938 and 1939. Net income was roughly one-third of gross profit in 1935 and 1936, about one-sixth in 1937, and vanished in 1938 and 1939. Net income for 1936 was nearly half the year-end net worth. In 1937 it was 18.35 per cent. Thereafter it was about zero. Net income in 1934 and 1935 approximated the year-end net worth and for 1936 was 47.25 per cent of net worth. This was a higher ratio of profits than

was shown by its competitors. If the higher earnings in 1936 offset the lower earnings in the later years, the average is not necessarily an inadequate standard of normal earnings. The actual average of the earnings of petitioner for the base period was $9,106.26. The average base period net income was determined by the respondent with adjustments made under section 713 (e) with respect to 1939, the only base period year of deficit. The average base period net income as so determined for the purpose of computing the excess profits credit for 1941 was $9,447.91, for 1942 was $12,039.86 and for 1943 was $11,809.89. The correctness of these computations is not challenged by the petitioner. This average base period net income is approximately 20 per cent of petitioner's net worth in the base period, an income ratio which compares favorably with the ratio of earnings to net worth of all listed corporations in the liquor industry and of the four largest in the industry, as shown in the statistics in our findings of fact. We can not say from the evidence that this is an inadequate standard of normal earnings for petitioner.

Petitioner relies principally upon its contention that a ruinous trade or price war existed in the base period years in the liquor industry in Kentucky. Treasury Regulations 112, section 35.722–3 (b), recognizes that a ruinous price war involving a taxpayer's industry, including the taxpayer, during several of the base period years, in which members of the industry sustained severe losses as a result of sales below cost, may be a temporary economic event unusual in the case of the industry and constitute a basis for relief under section 722 (b) (2). On the other hand, competition can not be considered a temporary economic event unusual in the case of a taxpayer or its industry, as competition is a normal factor in almost any business. See *Lamar Creamery Co.*, 8 T. C. 928, 939.

Business fluctuations, also, are normal conditions. A mere failure to maintain a given level of earnings does not establish a depression of earnings within the meaning of section 722. *George Kemp Real Estate Co.*, 12 T. C. 943. When the revival of the liquor industry was getting under way in 1934 and immediately thereafter, an enormous demand for legal liquor existed and the supply available consisted only of medicinal stocks of the prohibition era. Retailers entering the newly revived business sought to stock their shelves, thus creating a further abnormal demand until this was accomplished. Distillers operated on a year-round basis instead of the previously customary spring and fall seasonal basis. Many distillers entering the business were not sufficiently capitalized to afford to wait the four-year aging period necessary to bottle their product in bond, and resorted to selling a part of their warehouse receipts to procure operating capital. Retailers acquired some of these. Petitioner says the wholesalers were squeezed between the distillers and the retailers. The distillers

were requiring the pushing of their own brands and the retailers who had acquired warehouse receipts were demanding that the wholesalers clear the liquor for bottling under the retailers' brands for a nominal clearing fee. The wholesaler had to do this or lose the retailer as a customer. The sale of warehouse receipts, says petitioner, depressed the price of whiskey in 1937 and 1938 to the point where any reasonable profit was eliminated. Gifts and commissions became necessary to effect sales. The effect of the conditions in the industry was to increase petitioner's cost of doing business. At the higher cost it was unable to make profits. The then Commissioner of Revenue for Kentucky testified that during this period most of the wholesalers of liquor made little or no profit and some went out of business. The number of wholesalers licensed in Kentucky declined from about 70 on July 1, 1937, to 38 on July 1, 1938, with little change during the remainder of the base period.

Early in 1940 the Kentucky Legislature enacted legislation which required a minimum mark-up on liquor sales from producers to wholesalers and from wholesalers to retailers and prohibited donations, free goods, bribery, and rebates. This legislation was upheld by the Kentucky Court of Appeals in *Reeves* v. *Simons*, 289 Ky. 793; 160 S. W. (2d) 149. Petitioner argues that this decision judicially determined that a "price war" or "ruinous competition" existed in Kentucky in the base period years. That court commented upon evidence tending to show that, due to price cutting, chaos existed in the trade, and held that the act regulating the liquor traffic to eliminate ruinous competition was constitutional as a reasonable exercise of the police power. The only issue before the court was the constitutionality of the statute, and the court's comments on the evidence before it are not determinative of the facts to be found from the evidence before us for the purpose of construing a revenue statute in litigation between other parties. See *Guaranty State Bank of Greenville, Texas*, 12 B. T. A. 543; *First National Bank in Dallas* v. *Commissioner*, 45 Fed. (2d) 509, affirming 16 B. T. A. 719; certiorari denied, 283 U. S. 845.

Three witnesses testified on behalf of petitioner as to the conditions existing in the liquor industry in Kentucky in the base period years. They said there was fierce and destructive competition without regard to costs, in which most wholesalers made little or no profit and some incurred losses and went out of business, and that it was almost impossible to make any money. Petitioner argues that from their testimony it is clear that there existed a ruinous price war within the meaning of the regulations. We do not agree. Their testimony has been given due consideration in connection with the other evidence of record, but we think the evidence, as a whole, is not sufficient to

demonstrate more than keen competition, a factor which must be considered normal in the liquor industry.

Petitioner confined its business to the eastern part of Kentucky. In this it may have been at a disadvantage in competing with some other wholesalers who had the exclusive right to sell throughout the state the products of certain large distillers.

Although a number of the wholesalers licensed in Kentucky dropped out of business in the year July 1, 1937, to June 30, 1938, there was no further decline in the ensuing year. The statistics furnished by the respondent show that five wholesalers, competitors of petitioner, had in 1936 a lower ratio of net income to net sales than petitioner, that both petitioner and these competitors had a decline in this ratio in 1937, but the competitors, on the average, had no further decline while petitioner's income fell to nothing. Where, as here, many people enter a newly revived industry, in the hope of large profits, competition will ultimately eliminate the least efficient. When supply caught up with demand, that is what happened here. The competition became too stiff for the marginal dealers. If the conditions were as chaotic and ruinous as petitioner represents them to be, we would expect to see a further reduction in the number of surviving wholesalers in 1939, and the profits of petitioner's competitors should show a reduction in 1938 and 1939 comparable to that experienced by petitioner. We can not conclude from the evidence that petitioner has established that a "ruinous price war," as distinguished from keen competition, depressed the industry of which petitioner was a member in the base period years.

There is a further failure in petitioner's proof in that it has not established "a fair and just amount representing normal earnings to be used as a constructive average base period net income." Petitioner's application for excess profits tax relief proposed a constructive average base period net income of $26,149.26. This was computed by adopting the sales volume for 1936 as normal for the remainder of the base period and applying the average percentage of profit on its sales for 1934, 1935, and 1936, or 5.2997 per cent. We think the assumptions that 1936 sales and 1934 to 1936 percentages of profit on sales were normal are not warranted in the circumstances. 1934 was the first year of the revived industry. The demand was large and the supply small, profits were easy and the percentage of profit high. The succeeding years of 1935 and 1936 were still abnormal as to profits. Supply had not caught up with demand. When this occurred, perhaps in 1937 or 1938, the industry was overcrowded with dealers; some were forced out; others survived with little or no profits in the years 1938 and 1939; and others, as indicated by the statistics referred to above, derived a measure of profits, though somewhat less than in the early lush years. Sales in excess of those actually made by peti-

tioner could not reasonably be expected, nor a percentage of profit equal to that for 1934 to 1936. The constructive average base period net income proposed by petitioner is, therefore, not a fair and just amount representing normal earnings. While we might determine some other figure from the evidence, as in *Lamar Creamery Co., supra,* and *Dyer Engineers, Inc.,* 10 T. C. 1265, we are not called upon to do so in view of the failure of petitioner's proof in other respects.

We conclude that petitioner is not entitled to relief under section 722 of the code.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*