OPINION. HakRON, Judge: The only question in this proceeding is whether the respondent erred in disallowing petitioner’s application for excess profits tax relief under the provisions of section 722 of the Internal Revenue Code. If the petitioner establishes that the tax computed without benefit of this section “results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income,” then it must prevail. Sec. 722 (a). The petitioner relies upon section 722 (b) (2), under which the tax computed without benefit of section 722 shall be considered to be excessive and discriminatory if the taxpayer’s average base period net income is an inadequate standard of normal earnings because: (2) The business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry. Petitioner does not take the position that the industry of which it was a member was depressed during the base period years. But it does contend that its own business was depressed during those years, with the result that its average base period net income is an inadequate standard of normal earnings. We do not believe, however, that the petitioner has shown that its average base period net income was an inadequate standard of normal earnings. During the base period years 1936 and 1937, petitioner had net operating profits, exclusive of brokerage income, for the first time since 1928. In 1938 and 1939 it had net operating losses, exclusive of brokerage sales, which were substantially lower than the losses for any of the years since 1928, with the exception of the year 1930. Its average net operating profit per ton handled, exclusive of brokerage, during the base period was 29.75 cents, although in the seven prior years it had an average net loss per ton of 75 cents. During the base period years petitioner had an average net profit on brokerage sales of $2,425.41 on an average of 9,318 tons handled as broker. This compared favorably with the average net profit on brokerage sales of $2,152.47 from 1925 through 1928 on an average of 5,888 tons handled and $1,782.30 average net profit on brokerage sales from 1929 through 1935 on an average of 7,218 tons handled.[1] Petitioner relies principally upon the contention that a price war existed in the base period years among the firms, including petitioner, which collected and processed waste paper in Cleveland. Begulations 112, section 35.722-3 (b), recognizes that a ruinous price war may be a temporary economic circumstance unusual in the case of a taxpayer and may constitute a basis for relief under section 722 (b) (2). But active competition is a normal factor in business and can not be considered temporary or unusual. Lamar Creamery Co., 8 T. C. 928, 939; Monarch Cap Screw & Manufacturing Co., 5 T. C. 1220, 1230. And the evidence as a whole fails to show that the conditions under which the waste* paper industry operated in Cleveland during the base period were either temporary or unusual. The waste paper industry differs from most other businesses in that competition in it lies primarily in the prices which are paid to the sources of waste paper, such as department stores, office buildings, printing houses, and various industries. This is because high handling costs limit the sources of supply to those which accumulate large amounts of waste paper over a relatively short period of time. A firm entering the waste paper business in Cleveland from 1925 through 1939 could succeed only by developing adequate sources of waste paper. Only by offering higher prices for waste paper could a new concern take away from the established businesses the accounts of suppliers of waste paper. Similarly, an existing concern desirous of increasing its share of the market could do so only by increasing the prices which it was willing to offer the suppliers. It may very well be that the policy adopted by National forced petitioner to pay prices for waste paper in excess of prices which might otherwise have obtained. But the raising of petitioner’s costs by the activities of National was not the result of a price war; it was the result of the intense competition instigated by National among the waste paper dealers in Cleveland. Cf. Harlan Bourbon & Wine Co., 14 T. C. 97. National’s reasons for fomenting this competition are unimportant. The evidence does not show that National, through the payment of excessively high prices for waste paper, had embarked on a policy of destroying the industry in Cleveland because of certain real or imagined wrongs suffered by its president and general manager. National was interested in making a profit. It was also desirous of increasing its share of the market at the expense of its competitors. In furtherance of this policy, it embarked on a program of intense price competition. But once it had succeeded in taking away an account from one of its competitors through the payment of higher prices, it would shortly thereafter reduce the price to a point where it could make a profit on it. The net effect of National’s policy, however, was to antagonize its regular sources of supply, who were not paid the higher prices offered potential customers, and the number of tons of waste paper handled by National decreased steadily during the base period. During those same years, the number of tons handled by petitioner increased. Petitioner contends that the alleged price war had been in effect since 1929.[2] It is difficult to see how conditions under which an industry, or a segment of an industry, has been operating for 11 years can be characterized as temporary and unusual. And unless the economic circumstances under which the petitioner operated were temporary and unusual, it is not entitled to relief under section 722 (b) (2). ‘ The price practices among the waste paper dealers in Cleveland were part of the economic climate in which petitioner operated from 1929 until 1940. The evidence shows that the intensively severe price competition was a regular and expected occurrence in Cleveland during those years; that it was not temporary and unusual. We can not conclude from the evidence that the petitioner has established that its average base period net income is an inadequate standard of normal earnings because its business was depressed during the base period years due to a temporary economic circumstance, unusual in its' case, namely, a ruinous price war. It is held, therefore, that respondent was correct in refusing to allow petitioner’s claim for relief under section 722 (b) (2). Reviewed by the Special Division. Decision will be entered for the respondent. The lower prices paid for waste paper by tbe mills in tbe base period years account for tbe fact that tbe estimated average net profit on brokerage sales increased only 12.68 per cent over that of tbe years 1925 through 1928, although there was an increase of 58.24 per cent in tbe brokerage tons handled in the base period over 1925 through 1928. In any comparison between the base period and the years 1925 through 1928, it is significant to note that the percentage of brokerage sales to total sales increased 41.20 per cent in the base period over 1925 through 1928, from 28.42 per cent of net sales to 40.13 per cent. However, the average sale price per ton, upon which an estimated net profit of 2% per cent was made for both periods, decreased 28.79 per cent, from $15.35 per ton to $10.93 per ton. The exact date at which National began the keen price competition is not clear from the evidence. Petitioner claims "that the alleged price war was instigated by the president of National out of malice arising from his conviction of violation of the Interstate Commerce Act, for which he believed his competitors responsible. If this was the motivating factor, It is interesting to note that National’s president was not indicted until March 1932, and not convicted until November 1932. And a comparison of petitioner’s activities from 1929 through 1932 with its activities in the base period shows that its operations were much more profitable during the base period years. Petitioner had a net loss of $3,636.94 in 1929, a net income of $1,348.54 in 1930, a net loss of $13,226.74 in 1931, and a net loss of $15,198.22 in 1932. In the base period years, petitioner had a net income of $7,722.86 in 1936, a net income of $9,886.30 in 1.037, a net loss of' $3,059.20 in 1938, and a net loss of $1,,372.16 in 193.9.