BLAISDELL PENCIL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11099.   Promulgated June 29, 1951.

*Benjamin Mahler, Esq.*, for the petitioner.
*Arthur N. Mindling, Esq.*, for the respondent.

1472

## OPINION.

Van Fossan, *Judge:* The petitioner contests the respondent's disallowance of its claim for relief under section 722 (b) (2) and (b) (4)

of the Internal Revenue Code.[1] Petitioner contends that its base period net income was not normal because its business was depressed in the base period due to a temporary economic circumstance—a price war—such as to warrant relief under section 722 (b) (2). Petitioner contends further that it should be entitled to relief under section 722 (b) (4), alleging that it was committed on January 1, 1940, to a change in the character of its business. Petitioner's excess profits tax returns for the taxable years 1942 and 1943 show credits of $39,052.37 and $52,784.76, respectively, computed on the invested capital basis. Petitioner now seeks to show that its excess profits credits for the taxable years, computed under the average earnings method and using an average base period net income reconstructed under the provisions of section 722, exceed the credits available to it on the invested capital basis of computation. See Regs. 112, sec. 35.722–1.

Under section 722 (b) (2), petitioner must show that its average base period net income is an inadequate standard of earnings because its business was depressed in the base period due to a temporary economic event unusual in its industry and that the excess profits tax

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\* \* \* \* \* \* \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713. if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or .because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period. the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor. with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939. as a result of a course of action to which the taxpayer was committed prior to January 1, 1940. or any acquisition before May 31. 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, or

\* \* \* \* \* \* \*

determined without the benefit of section 722 is excessive and discriminatory. Petitioner must further establish what would be a fair and just amount representing normal earnings to be used in a constructive average base period net income.

Petitioner contends that the temporary economic event in its industry was a "ruinous price war" which depressed the whole industry and consequently its own business. Petitioner's witnesses, men connected with the pencil manufacturing business, so described the status of competition in the industry between 1935 and 1939. The Federal Trade Commission, in a suit charging the wood cased pencil manufacturers with price fixing, also stated that a price war existed in 1935 and 1936.

There is no mention in the Code of a price war as being a temporary economic event within the meaning of section 722 (b) (2). Respondent's regulations, however, (Regulations 112, section 35.722–3) justify petitioner's contention that a price war, if proven to exist, is a temporary economic event such as might cause the base period net income of a member of the industry to be considered depressed. The proof must establish both the existence of the event and the fact of the depression.

It is well to note the emphasis, in both the Regulations and the Code, placed upon the word "temporary." The record here shows that competition in the wood cased lead pencil industry was based largely on price in the years 1936 to 1939 (particularly in the cheaper pencils which constituted most of the volume). The proof does not show that this condition was more "temporary" or less general than competition between members of any other industry during that period. To characterize a condition as a "price war" is not an end of petitioner's burden of proof. Inasmuch as the years 1936 to 1939 are prescribed by law as the base period, the answer to the question whether competition in any particular business during that period could be termed a qualifying price war, must depend to a large extent on comparison with contemporary competition in other businesses. Petitioner's gross profits in its wood pencil division changed very little during the base period years. In the years prior to 1934 and 1935 the old and established northern manufacturers enjoyed comfortable profits. The entry into the field of the several southern manufacturers of wood cased lead pencils was the cause of the competition which the petitioner contends depressed its business. There was, however, nothing temporary about the existence of the southern manufacturers who were partly the cause of the alleged "price war"—they were in the industry to stay. It was but natural that these new companies should compete in any manner open to them, viz., on the basis of more favorable prices at which they were willing to sell their product. In order

to retain their share of business the older companies were in turn forced to cut prices. The petitioner's witnesses characterize this sort of competition as ruinous and stated that it was the purpose of the new competitors in reducing their prices, below the former levels, principally to break the older manufacturers and drive them out of the business. Petitioner's witness testified that "There are certain kinds of pencils in the pencil industry which largely move on price and price alone. There are other kinds of pencils that move on the basis of quality and the number of people who recognize the quality and are willing to pay a reasonable price for that quality, and the number of people who know the quality depends upon the kind of advertising, promotion and sales job that you do."

In our opinion, the characterization of this competition as a "ruinous price war" has fallen short of establishing within the meaning of the Code that it was a temporary economic event. This is not to say that petitioner would qualify if the price war existed but for a short time or that it would not qualify if the same conditions existed for all of the base period. The fact remains that for the demand that existed during the base period for the petitioner's product in question, there apparently existed a greater number of suppliers than could profitably share the business available. Such being the situation, it is impossible for us to say that the competition of those suppliers for the limited demand, even if that competition be characterized as a "price war," was a temporary economic event. Apparently competition was always keen in the pencil manufacturing business. It is important to note in this connection that it was conceded by petitioner's witnesses that the end of the alleged "price war" was due in a large part to the increased demand for pencils following the beginning of the war in Europe in 1939. It was due to this factor that the close competition in the base period was somewhat lessened. But for the increased demand in 1939, competition in the industry would have continued on the same basis. If competition had been as ruinous during the base period as contended by petitioner, we would expect the elimination of the marginal producers. *Harlan Bourbon & Wine Co.*, 14 T. C. 97. Yet after four or five years of close competition, only one or two pencil manufacturers were eliminated and they were almost immediately replaced by others. This does not indicate that the competition in which petitioner found itself was temporary and unusual. *Winter Paper Stock Co.*, 14 T. C. 1312.

There is another aspect of the question under section 722 (b) (2) which petitioner has failed to meet. Even if the other members of the industry were depressed, petitioner must show that because of the "price war" *its* business was depressed during the base period. The evidence shows that the wood cased lead pencil division of petitioner's

business was merely an adjunct to its principal business of manufacturing paper cased pencils. The testimony was to the effect that since petitioner had a profitable business in paper cased pencils it did not enter, to any great degree, the close competition for sales of cheap wood pencils but "stayed away" from that type of competition as much as possible. Petitioner had an exclusive patent process on one type of paper cased pencil and was competing with only two other firms as to another type. The evidence shows that petitioner initially entered the wood cased pencil field principally in order to assist its sales of paper cased pencils. Also, petitioner is closely affiliated with the largest producer of wood cased pencils from whom, until after 1939, it bought its wood cased pencils in rough form, merely finishing the raw product and stamping it with its own name. The inference from the record is that the coordinate policy of the two affiliates was that petitioner would concentrate on its profitable line of paper cased pencils and its affiliate would manufacture for petitioner its wood cased pencils. Since petitioner's wood cased pencil division showed a net loss in every year after 1924, it is apparent that the continuation of that line was for reasons other than a direct profit thereon. Petitioner stopped making several items of miscellaneous stationery supplies because they were unprofitable, yet it continued to make the wood pencils at a substantial net loss in every year. Petitioner stated in support of its application for relief that:

The manufacture and sale of wood encased pencils is necessary and imperative in order to make possible the sale of paper pencils. This is true because in order to meet competition, salesmen are obliged to carry a complete line of wood encased pencils as well as paper pencils so that customers can buy from one source, all requirements of pencils and thus eliminate the purchase of paper pencils from one source and wood encased pencils from another.

The manufacture and sale, therefore, of wood encased pencils has become a necessary adjunct to the manufacture and sale of paper pencils, and in grossage, the sale of wood encased pencils has greatly exceeded the sale of paper pencils although the average price per gross of paper pencils is far greater than the average price per gross of wood encased pencils. * * *

The question of the normalcy of the losses shown in the base period years by petitioner's wood cased pencil division, should be examined in a somewhat different light than if the division were self-sufficient.

Apparently the petitioner and its affiliate shared the services of the officers of the two companies, but in a degree not explained in the record. Petitioner speaks in its brief of its officers giving "concurrent services to the Eagle Pencil Company, their other employer * * *." Respondent contends that the increased losses in the wood cased pencil division during the base period were due to the large increases in salary paid to petitioner's officers. Petitioner's witness stated that the officers had been doing the same job since 1920 and that their increased salaries during the base period had been ac-

cepted as reasonable by the respondent in the latter's audit of petitioner's returns. The fact is clear, however, that there would have been no increase in the losses continually suffered by petitioner in the wood cased pencil division had these salary increases not been made during the base period. Petitioner is in the anomalous position of arguing that it was in a "ruinous price war" during a period when it more than tripled its officers' salaries. The amount of those salary increases was considerably greater than the amount petitioner claims its business was depressed because of the alleged price war. The fact that respondent allowed a deduction for the salaries proves nothing here.

In our opinion, the petitioner has not shown that its business was depressed during the base period within the meaning of section 722 (b) (2) of the Code.

We come next to the petitioner's contention that it is entitled to relief under section 722 (b) (4) of the Code.

In 1939, the decision was made that the petitioner would acquire the necessary equipment and begin the manufacture of the raw stock pencils of the standard diameter black lead type which it had previously bought from its affiliate, the Eagle Pencil Company. To that end the petitioner bought machinery designed for the purpose of such manufacture although it did not acquire all of the machinery so needed until sometime in 1940. In 1939, the petitioner also acquired a substantial amount of the wood slats from which the raw stock pencils are made. By October 1940 the petitioner was, to a limited extent, manufacturing its raw pencil needs, at least insofar as the standard diameter pencils were concerned. By the end of 1941 the petitioner was manufacturing all of its standard diameter pencils and had begun the gluing operation on some of the colored pencils and on some of the indelible pencils. There is a serious question as to just which of the petitioner's pencils it was committed to manufacture on December 31, 1939. The testimony of the petitioner's witnesses shows that by December 31, 1939, the decision was to manufacture only the standard diameter black lead pencils and later, after the manufacture of those pencils was begun, it was determined that the petitioner would expand and enter upon the manufacture of the other pencil lines. We have found as a fact that petitioner was committed on December 31, 1939, only to the manufacture of its standard diameter black lead pencils.

Petitioner can therefore reconstruct its net income only with consideration for what it was committed to do on December 31, 1939. That is, the reconstruction can include only what petitioner would have saved from the manufacture instead of the purchase of standard diameter black lead wood cased pencils.

In the petitioner's reconstruction of its average base period net income the largest amounts representing the increases in petitioner's net income under its claim for relief under section 722 (b) (2) involve the alleged price war. We have determined above that the petitioner is not entitled to relief under that section and by excluding from its reconstruction the amounts involving 722 (b) (2) relief, we see that petitioner claims reconstructed income in the base period years as follows:

| Year | Gross amount sold | Saving at $0.19 per gross | Reported ncome | Net income as reconstructed by addition of amount saved |
|---|---|---|---|---|
| 1936 | $127,410 | $24,207.90 | $34,525.76 | $58,733.66 |
| 1037 | 117,664 | 22,356.16 | 27,536.52 | 49,892.68 |
| 1938 | 105,818 | 20,105.43 | 15,540.70 | 35,646.13 |
| 1939 | 101,531 | 19,290.89 | 38,016.47 | 57,307.36 |
| Total | | | | 201,579.83 |
| Average reconstructed base period net income | | | | 50,394.96 |

The substance of this claim is that petitioner alleges that it paid between 77 cents and 79 cents per gross for its standard diameter black lead pencils during the base period years and that the changes in manufacture to which it was committed on December 31, 1939, would have enabled it to have manufactured those pencils at an average of 58 cents per gross, representing a saving in manufacturing cost of the raw pencil of approximately 19 cents per gross. The respondent contends that the petitioner's purchase costs include the higher costs of the indelible pencils and the colored lead pencils, the manufacture of which the petitioner was not committed to on December 31, 1939.

The respondent also contends that the petitioner's figure, representing what it would have cost to manufacture its own raw stock pencils during the base period, is not accurate inasmuch as those costs were based largely on post base period costs which the facts show were somewhat higher than they would have been during the base period. This difference is immaterial for reasons which follow and for purposes of considering the argument we accept the cost figure of 58 cents.

It is further apparent that had petitioner been manufacturing during the base period the standard diameter black lead wood cased lead pencils instead of buying the raw stock pencils, its saving should be based on the number of gross of raw pencils *bought*, not the number of finished pencils *sold* as was done in petitioner's computation above. By referring to the list of purchases of raw stock pencils in the Findings of Fact and using the first seven items which we have deter-

mined were the only ones petitioner was committed to manufacture on December 31, 1939, we arrive at purchases of those pencils in each year, as follows:

| Year | Gross |
|------|------:|
| 1936 | 109, 706 |
| 1937 | 109, 844 |
| 1938 | 69, 040 |
| 1939 | 77, 169 |
| Total | 365, 759 |

Petitioner paid for these purchases of raw stock pencils in each year, the following total amounts:

| | |
|------|------:|
| 1936 | $70, 574. 60 |
| 1937 | 71, 627. 92 |
| 1938 | 47, 697. 44 |
| 1939 | 52, 745. 98 |
| Total | $242, 645. 94 |

By dividing the total cost by the total bought we arrive at an average cost per gross of $.66.

If we accept petitioner's figure of 58 cents representing what it contends it would have cost to make each gross, then a saving of 8 cents per gross results. The total purchases of these pencils during the base period were 365,759 gross, which if made by petitioner at a saving of 8 cents per gross, would be an addition to petitioner's total reported base period income as follows:

| | |
|------|------:|
| Total base period reported income | $115, 619. 45 |
| Saving at 8 cents on purchases | 29, 260. 72 |
| Total base period income, reconstructed | $144, 880. 17 |
| Average | $36, 220. 04 |

This figure represents the petitioner's average base period net income reconstructed to allow for the amount it would have saved had it been manufacturing during that period, the pencils it was committed to manufacture on December 31, 1939. This computation thus gives effect to a reconstruction of the entire base period income which we hold did not otherwise "reflect the normal operation" within the meaning of section 722 (b) (4). Cf. the manner of computation in *Lamar Creamery Co.*, 8 T. C. 928; E. P. C. 31, 1948–1 C. B. 93. Petitioner is thus entitled to use a credit based on a constructive average base period net income of $36,220.04. This amount exceeds the credit otherwise computed under the average earnings method without the benefit of section 722. But petitioner gains no advantage by the reconstruction of net income under section 722 (b) (4) for the reason that it is entitled to credits of $39,052.37 and $52,784.76 for the taxable years 1942 and 1943 under a computation based on the invested capital method.

We hold that the tax computed without the benefit of section 722 is not excessive and discriminatory and that therefore respondent did not err in denying relief.

Another issue relating to petitioner's carry-over of unused excess profits tax credits has been rendered moot by our holding on the primary issue.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*