GREEN SPRING DAIRY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7871, 22807. Promulgated May 9, 1952.

*Hugh C. Bickford, Esq.,* and *Morton P. Fisher, Esq.,* for the petitioner.

*Arthur Mindling, Esq.,* for the respondent.

229

OPINION.

Raum, *Judge:* Petitioner commenced business in 1932, processing and distributing milk, cream, and other dairy products. Its growth was continuous and vigorous, and it was still growing at the end of the base period, December 31, 1939. It had been apparent during the early years of its life that, if its growth were to continue, its existing plant capacity would become inadequate to handle all its business. Petitioner in 1937 constructed a new and modern plant, with a much greater productive capacity, at just about the time when its sales had reached the point calling for maximum utilization of the productive capacity of the old plant. It moved into the new plant in September 1937, and thereafter continued steadily to increase its sales during the remainder of the base period.

Although petitioner was entitled to compute its excess profits taxes for the years in controversy, 1940-1945, by using the credit based upon its base period net income, together with such accompanying benefits as would be afforded by the so-called growth formula in section 713 (f) of the Code, it chose instead to use the alternative credit based upon invested capital. It had excess profits tax net income in an amount less than $16,000 for 1936, and in an amount less than $27,000 for 1939;

the years 1937 and 1938 were deficit years. However, on the invested capital method, petitioner was entitled to excess profits credits ranging from $36,513.66 to $46,884.82, depending upon the year involved. Thus, petitioner's credits based upon the invested capital method were considerably in excess of any credits available under the income method, even after taking into account the section 713 (f) growth formula. Petitioner nevertheless contends that the tax thus computed for each of the years involved was "excessive and discriminatory," and it seeks relief under section 722,[2] and particularly under subparagraph (b) (4).

Section 722 (b) (4) provides that the tax shall be considered excessive and discriminatory if the taxpayer's average base period net income is an inadequate standard of normal earnings "because" the

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, \* \* \*.

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

taxpayer "changed the character of the business" during the base period and "the average base period net income does not reflect the normal operation for the entire base period." And a "change in the character of the business" is defined to include "a difference in the capacity for production or operation." Accordingly, in view of the construction of the new plant, petitioner has established that there was a "change in the character of the business" within the meaning of (b) (4). This does not mean, however, that it automatically becomes entitled to relief. For, the statute provides in addition that it must show that its average base period net income is an inadequate standard of normal earnings "because" of this factor, and must show still further under section 722 (a) "what would be a fair and just amount representing normal earnings." See Bulletin on Section 722, pp. 4–5; E. P. C. 16, 1947–1 C. B. 90. Moreover, even if section 722 (b) (4) were otherwise fully applicable, no relief would be forthcoming here unless petitioner can show that the invested capital credit actually used by it was less than the credit based upon constructive average net income which it has established. *Lamport Co.*, 17 T. C. 1079, 1084–5; *General Metalware Co.*, 17 T. C. 286, 292; *Blaisdell Pencil Co.*, 16 T. C. 1469, 1484. For reasons which will appear presently we think that petitioner has failed to show constructive average net income in an amount sufficient to produce credits in excess of those which it actually used.

In the application of (b) (4), petitioner relies upon the so-called push-back rule, which is set forth in the second sentence of those provisions as follows:

If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time.

Seeking to apply these provisions, petitioner contends that the productive capacity of its old plant restricted its sales and earnings in the base period and, if the new plant had been available in 1935 instead of 1937, it would have sold at least 2,550,000 gallons of milk in 1939 and its earnings would have been not less than $106,890.09 in 1939. It seeks the benefit of a constructive average base period net income predicated upon that amount. We are satisfied that no such level of sales or earnings could have been attained merely because the new plant had come into being in 1935 rather than in 1937. Moreover, we are also satisfied that petitioner has failed to show that it would have achieved a level of growth by the end of 1939 with earnings of such magnitude as to produce credits based on constructive average base period net income greater than the credits actually used by it.

Petitioner's actual growth, from 1932 (its first year) through 1939, is strikingly shown by the following table which we have taken from our findings:

| Year | Number of retail milk routes at end of year | Customers at end of year | Increase in customers over previous year | Gallons of fluid milk sold | Increase in gals. over preceding year | Total employees, end of year |
|------|------|------|------|------|------|------|
| 1932 | 12 | 1,500 | ---------- | 45,000 | ---------- | 28 |
| 1933 | 18 | 3,000 | 1,500 | 292,432 | 247,432 | 56 |
| 1934 | 30 | 6,000 | 3,000 | 543,785 | 251,353 | 84 |
| 1935 | 40 | 7,500 | 1,500 | 1,108,685 | 564,900 | 107 |
| 1936 | 49 | 12,000 | 4,500 | 1,207,763 | 99,078 | 126 |
| 1937 | 57 | 15,000 | 3,000 | 1,322,851 | 115,088 | 166 |
| 1938 | 67 | 17,500 | 2,500 | 1,581,910 | 259,059 | 170 |
| 1939 | 73 | 20,000 | 2,500 | 1,917,436 | 335,526 | 174 |

The foregoing data furnish dramatic evidence that petitioner's business was growing steadily without the new plant prior to 1937. However, the old plant was reaching its saturation point at about that time, and if the growth was to continue, enlarged facilities would have to be supplied. This does not mean that the new facilities *caused* the growth thereafter. Rather, the enlarged facilities afforded by the new plant enabled the growth to continue. The prior advent of the new plant 2 years earlier does not persuade us that petitioner's growth during that 2-year period would have been substantially greater than it in fact was. And we are similarly not persuaded that petitioner would have attained a level of sales by the end of 1939 that would have been substantially higher than was in fact attained at that time.

The evidence establishes, in our opinion, that productive capacity did not operate materially to restrict petitioner's sales during the first two base period years, 1936 and 1937. No evidence has been introduced to show that in either of those years any customers or sales were lost because petitioner's production facilities were inadequate; on the contrary, there is evidence that both in 1936 and 1937 petitioner could have served at least some additional customers if it had been able to get them. In both years major strides were made in increasing the number of new customers and new routes, and petitioner's growth appears to have been about as much as market and competitive conditions then permitted. While petitioner experienced difficulty with its facilities toward the end of 1935, the difficulty lay in its distribution and storage facilities and not in its production facilities; moreover, corrective measures were taken before the end of 1935 to increase distribution and storage capacity through the opening of a branch station. Although there was undoubtedly a certain amount of congestion in petitioner's plant, we are satisfied that it had not yet reached the limit of its capacity, and that its sales or acquisition of new customers was not in any way impeded. Throughout these years petitioner's operation

and management were in the hands of tried and capable businessmen, who had the resources to construct a new plant earlier if it had been necessary, and we are unable to conclude that they did not act in time.

Petitioner contends that it deliberately reduced its sales effort in 1936 and 1937 because it had reached its ceiling in productive capacity. The record leaves this in considerable doubt. Rather than a substantial relaxation there is evidence of a sustained sales effort in the continued rise in those years of new customers and new retail routes, in the growing ratio of raw milk bought by petitioner to the total raw milk bought by other dairies in the area, and in the sizeable increase in petitioner's dollar sales for 1937. Nor does the evidence show that there was any appreciable reduction in advertising expense during 1936 and 1937. If there was a significant relaxation in sales effort, the evidence fails to establish its nature or the extent to which it caused a reduction in sales and net income during those years. Petitioner also asserts that the planning and construction of the new plant resulted in a neglect of attention to sales. While petitioner's management undoubtedly concerned itself with the new plant, the evidence is inconclusive that as a consequence there was any serious diversion in sales effort. Petitioner's route drivers, who constituted its principal "sales force," continued with a substantially undiminished incentive to increase sales, and there is nothing to show their efforts were relaxed. Although the number of "solicitors" declined during these 2 years, the reduction appears to have been part of a permanent program, because the number of solicitors was not subsequently increased after the new plant came into existence.

The new plant was opened in September 1937, and thereafter there could be no question about the existence of sufficient productive capacity. For the rest of the base period, the number of customers and of retail routes, and the volume of sales, increased as well. We cannot find that achievement at the new plant was substantially handicapped or sales or earnings were there materially reduced by the productive facilities which antedated it, and we think the record requires the conclusion that it would not have made a marked difference in petitioner's sales or earning level, either during the base period years or at the end of the base period, if the new plant had opened in 1935 rather than 1937.

True, the new plant was an attractive structure with unusual features, and had petitioner been able to commence an aggressive sales promotion program making maximum utilization of its facilities for that purpose 2 years earlier, it might well have attained a level of sales somewhat higher than was in fact reached. But petitioner was growing, wholly apart from the new plant, and we cannot say that the attractions provided by the new plant were of such character that

the growth after its supposed completion in 1935 would have been due in any substantial amount to the plant rather than to the other forces which spurred the growth prior to the new plant. Certainly, we cannot find on this record that the 2-year prior advent of the new plant would have resulted in a 1939 level of earnings of such magnitude as to produce credits that would be greater than the credits actually used. The latter were substantially higher than credits based on petitioner's actual base period earnings, and we conclude that petitioner has failed to establish constructive earnings of such magnitude as to result in higher credits than those employed by it.

A basic fallacy in petitioner's position is the premise that in applying the push-back rule we must assume not only that the new plant was constructed in 1935 rather than in 1937, but also that the new plant commenced business in 1935 with the level of sales that was in fact reached in 1937 when the plant actually began operation. The latter assumption does violence to the theory of the push-back rule. We are required to assume merely that the (b) (4) "change" occurred 2 years earlier. In the context of this case, this means only that we are to assume that the new plant was constructed in 1935 rather than in 1937. The new plant is superimposed upon conditions as they existed in 1935 including the then level of sales. Cf. *National Grinding Wheel Co.*, 8 T. C. 1278. Under petitioner's theory, the 2-year growth actually attained by it as of September 1937, when the new plant was opened, would be treated as having been achieved in September 1935 and used as a starting point for computing hypothetical growth from September 1935, thus enabling it artificially to pyramid growth upon growth. We think that no such extraordinary result was ever intended by the statute, and its plain language indicates otherwise.

Although petitioner's various applications for relief were predicated upon section 722 (b) (2), (b) (4), and (b) (5), and although these grounds were summarized at the outset of petitioner's brief, the only basis for relief actually urged upon this Court was the one founded on the push-back rule in (b) (4). In the circumstances the other grounds must be deemed to have been abandoned.

As to the calendar years 1940 and 1941, which are the only years involved in Docket No. 7871, additional reason exists for affirming respondent's denial of relief. The claims filed for those years included a claim for relief under subsection (b) (4). The ground of this (b) (4) claim was that, because the capacity of the new plant was in excess of petitioner's needs at the time operation of the new plant began, petitioner "was thereby burdened with fixed and other operating charges in excess of those normal for its current operations. Therefore, the income for part of the year 1937 and the years 1938 and 1939 has been adjusted [in arriving at a proposed recon-

structed income] to eliminate the expenses applicable to the unused capacity." This claim obviously was based on excessive expenses, and not on abnormally low sales; no complaint was made about the sufficiency of revenues, or that they should have been greater, but only that excessive expenses had left an insufficient net return.

It was this (b) (4) claim that was denied by respondent in his determination of February 13, 1945, and it was from that determination that petitioner appealed in 1945 in Docket No. 7871. It was only after respondent's denial and after commencement of the proceeding in Docket No. 7871 that additional information was presented to respondent and a push-back claim was asserted before him in June 1947. The only (b) (4) claim now urged by petitioner in Docket No. 7871, a push-back claim based on abnormally low sales, was not presented to the Commissioner and was not ruled on by him, and therefore cannot be considered by us. Cf. *Wadley Co.*, 17 T. C. 269, 281–282; *Block One Thirty-Nine, Inc.*, 17 T. C. 1364, 1370–1371; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1229; *Blum Folding Paper Box Co.*, 4 T. C. 795, 799.

Reviewed by the Special Division.

*Decisions will be entered for the respondent.*