HOUGLAND PACKING COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42113.    Filed May 28, 1957.

*Sol Goodman, Esq.*, and *M. S. Cassen, Esq.*, for the petitioner.
*R. G. de Quevedo, Esq.*, and *Lyman G. Friedman, Esq.*, for the respondent.

524

## OPINION.

MULRONEY, *Judge:* Petitioner was engaged in the business of canning corn and tomatoes during the years here involved. Petitioner seeks relief from excess profits tax for the years ended June 30, 1942, 1943, 1944, 1945, and 1946, under section 722 (b) (1), (b) (2), (b) (3), and (b) (5).[1] It is the argument of the petitioner that drought condi-

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle, or

(B) sporadic and intermittent periods of high production and profits, and such periods are inadequately represented in the base period,

*       *       *       *       *       *       *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

tions in 1936 and an overproduction of corn and tomatoes in 1937 caused lower earnings during the base period years. To obtain relief petitioner must connect these events with its own net income for the base period years. It must show that its average base period net income is an inadequate standard of normal earnings because of one or more of the factors mentioned in the sections relied upon for relief. *A. B. Frank Co.*, 19 T. C. 174, affd. 211 F. 2d 497; *Trunz, Inc.*, 15 T. C. 99. The causal relationship cannot be left entirely to surmise. *A. B. Frank Co., supra.*

Petitioner in its short brief has largely ignored these problems. Although section 722 (b) (1), (b) (2), (b) (3), and (b) (5) are mentioned, there is no serious effort by the petitioner, apart from a recitation of some of the statutory language, to develop arguments under each of these sections. It appears, however, that petitioner's emphasis is on section 722 (b) (1) and (b) (2), and consequently we shall first examine its claim for relief in the light of these sections.

Petitioner relies upon the alleged drought in 1936 and the overproduction of corn and tomatoes in 1937 as factors qualifying it for relief. Total precipitation, in inches, at Indianapolis, approximately 20 miles from petitioner's cannery, for the years 1936, 1937, 1938, and 1939 was 33.47, 44.15, 43.29, and 40.11, respectively. Over the longer period 1923 to 1939 the average precipitation in this area was 38.87 inches. We are not convinced that a variation of this degree in the precipitation for 1936 from the average precipitation over the longer period qualifies as an event "unusual and peculiar" in the experience of the petitioner. Nor are we persuaded that the overproduction of corn and tomatoes in 1937 was such a qualifying event within the meaning of section 722 (b) (1). We have difficulty determining just what petitioner is arguing, but if it is actually arguing that the overproduction of corn and tomatoes in 1937 brings it within section 722 (b) (2), we still do not believe that such overproduction can be regarded as a qualifying factor. In *Industrial Yarn Corporation*, 16 T. C. 681, 689, where the taxpayer sought relief under section 722 (b) (2) with the argument that a record cotton crop caused a temporary and unusual depression of prices, this Court said:

It is not unusual for a cotton crop to vary in size from year to year. The fortuitous circumstances that 1937 may have produced a cotton crop of extraordinary size does not, of itself, create an abnormality in petitioner's business of the character sufficient to bring petitioner within the scope of [section 722 (b) (2)] * * *

Assuming that the drought condition in 1936 and the overproduction in 1937 were qualifying factors within section 722 (b) (1) and (b) (2) we must still find the causal relationship, if any, between these factors and petitioner's low base period earnings. The average

excess profit net income of the petitioner and its predecessor partnership over the base period was $7,197.92, while the average over the longer period, 1923 to 1939, inclusive, was $31,515. To make a true comparison of the income of the longer period with that of the base period it is essential to make adjustments to the income of the predecessor partnership in an amount which will approximate the deductions allowed to the petitioner for officers' compensation. If the income of the predecessor partnership for each of the years 1923 to 1932 is adjusted downward by $24,400, which amount represents the officers' compensation allowed to the petitioner in 1933, the average income over the 17-year period becomes $21,975.56.[2]

We have indicated that the petitioner's average excess profits net income for the base period was slightly over $7,000. Petitioner seizes upon this low income figure for the base period, points to an alleged drought in 1936 and to the overproduction of corn and tomatoes in 1937, and without more, reaches the conclusion that it qualifies for relief. We cannot agree. Under section 722 (b) (1) it is necessary to show that average base period net income is an inadequate standard of normal earnings *because* the alleged "unusual and peculiar" events interrupted or diminished the normal operations of the petitioner during one or more of the base years, and under section 722 (b) (2) it is necessary to show that the inadequacy of base period earnings as a standard was *because* the business of the petitioner was depressed in the base period because of temporary economic circumstances unusual in the case of the petitioner or in the case of an industry to which petitioner belonged. As this Court pointed out in *Harlan Bourbon & Wine Co.*, 14 T. C. 97, 104, "A mere failure to maintain a given level of earnings does not establish a depression of earnings within the meaning of section 722." We have examined the record and are unable to discover any evidence to support petitioner's arguments that the alleged drought in 1936 and the overproduction in 1937 caused the low earnings during the base period.

In the first place, petitioner does not segregate anywhere, by products, the figures for sales or gross profits. There was testimony that the processing cost differed for corn and tomatoes, with corn being more expensive to process, but we are not told the nature and extent of this difference. In 1936, when the alleged drought occurred, the tomato crop purchased by petitioner from the contracted acreage was normal, while the corn purchases were substantially lower. However, without the necessary segregation of profits from each operation, it

---

[2] In determining its net income for the years 1923 to 1932 the predecessor partnership deducted partners' salaries ranging from a low of $5,050 in 1923 to a high of $10,400 in 1928. These salary deductions have been eliminated prior to the adjustment of $24,400. It must also be pointed out that, in addition to partners' salaries, there were drawings by the partners which, over the period 1923 to 1932, averaged $41,918.

is impossible to begin to trace the effect of the low corn yield in 1936 on petitioner's profit for the base period. Also, we have examined the evidence and cannot discern any relationship between petitioner's level of production and its annual earnings. In petitioner's and its predecessor's 4 highest years, 1925, 1926, 1935, and 1937, it purchased an annual average of 11,354 tons of corn and tomatoes and showed an annual average of excess profits net income (before deduction for partners' and officers' salaries) in the amount of $58,054, while in the 4 years of lowest production, 1923, 1924, 1933, and 1936, it made average annual purchases of corn and tomatoes amounting to 5,272 tons and showed an average annual excess profits net income of $60,874. In the 4 years of its lowest excess profits net income, 1931, 1932, 1938, and 1939, petitioner showed average annual profits of $3,540, while the average purchases of corn and tomatoes were 7,809 tons, which amounted to 92 per cent of the average purchases, or production, in the 4 highest years. Also, it appears that the average sales of $333,785 during the base period are not materially different from the average sales made by petitioner and its predecessor during the 17-year period 1923 through 1939, amounting to $349,453. Indeed, the average sales during the base period were slightly higher than the average sales, amounting to $332,845, during the 6 years immediately preceding the base period years.

In connection with the overproduction of corn and tomatoes in 1937 which petitioner argues had an adverse effect on its base period earnings, there is no evidence enabling us to measure the effect of such overproduction on petitioner's operations. We recognize that a distortion in inventory carryover from year to year would have its effect on annual earnings, but here again we cannot make the necessary analysis because petitioner's inventories are a conglomeration of labels, cans, boxes, and supplies, as well as canned corn and tomato products.

It is not necessary at this time to determine why the earnings of the petitioner were lower in the base years than over the longer period. *Trunz, Inc., supra.* However, there are indications in the record of some of the reasons for the lower earnings of the petitioner during the base years. Although gross profits from sales in the base period remained fairly normal, operating expenses showed a marked increase over the long-term period from 1923 to 1939, and petitioner makes no claim that the increased operating expenses were due to the alleged drought conditions in 1936 or to the overproduction of corn and tomatoes in 1938. Average gross profit on sales for the base period was $122,579, and the average gross profit on sales over the long period from 1923 to 1939 was $131,463. During the 6 years preceding the base period the average gross profit from sales was $121,606. The average of the operating expenses of the petitioner over the long period

from 1923 to 1939 was $100,372, while the average of the operating expenses over the base period was $116,574. During the 6-year period preceding the base period the average operating expenses were $93,848. Some of the averages of individual items of expense which showed marked increases in the base period years over the longer period from 1923 to 1939 were salaries and wages, from $37,061 to $47,397, taxes, from $2,159 to $4,338, insurance, from $3,470 to $4,668, and officers' and partners' compensation, from $14,583 to $20,069. Another cause which could conceivably contribute to the lower earnings during the base period is the indication of a declining profit margin in petitioner's operations. The farm prices of tomatoes and corn in Indiana during the base period were 95 per cent and 99 per cent, respectively, of the average farm prices of these same products during the period 1922 through 1939. While these farm prices were fairly constant, the average wholesale price of canned corn f. o. b. midwestern canneries during the base period was 86.24 per cent of the average wholesale price from 1922 through 1939, and the average wholesale price of canned tomatoes f. o. b. Indiana during the base period was 79.37 per cent of the average wholesale price during the long period of 1922 through 1939. It also appears that between the years 1930 and 1934 a change took place in the purchasing practices of petitioner's customers from the method of purchasing futures, in which all purchases were made prior to the canning season, to the spot-buying method whereby purchase and delivery of the canned products were made after the products had been packed. We are not given any information to gauge the effect of these changes on petitioner's operations, yet it is significant that petitioner's sales, which were $534,825 in 1934, fell to $418,836 in 1935, while the total corn and tomatoes purchased by petitioner rose from 8,647 tons in 1934 to 11,189 in 1935.

We hold that petitioner has not established its right to excess profits tax relief under section 722 (b) (1) and (b) (2).

Petitioner also claims excess profits tax relief under section 722 (b) (3) (A) and (b) (3) (B), under which it must be shown that "the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to (A) a profits cycle differing materially in length and amplitude from the general business cycle, or (B) sporadic and intermittent periods of high production and profits, and such periods are inadequately represented in the base period." Petitioner has completely failed to carry its burden of proof on this portion of its claim. We are not given any industry statistics or other evidence which would enable us to determine whether or not there were conditions prevailing in such industry that caused a depression in petitioner's business. No information is sup-

plied to us concerning profits cycles or sporadic periods of high production and profits. We hold that petitioner is not entitled to excess profits tax relief under section 722 (b) (3) (A) or (b) (3) (B).

Petitioner's claim for relief under section 722 (b) (5) must also be denied since it is not based on "any other factor" than those which are specifically mentioned in section 722 (b) (1), (b) (2), (b) (3) (A), and (b) (3) (B). *Crane Co. of Minnesota*, 25 T. C. 727; *Gulf Coast Broadcasting Co.*, 24 T. C. 1094.

We conclude that petitioner has failed to establish that its average base period net income is an inadequate standard of normal earnings because of the reasons explicitly set forth in section 722 (b) (1), (b) (2), (b) (3) (A), (b) (3) (B), and (b) (5), and consequently must deny petitioner's claim for excess profits tax relief under these sections.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*