THE OLD HOMESTEAD BREAD CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32824.   Filed April 30, 1957.

*Claude M. Maer, Jr., Esq., Stephen H. Hart, Esq., John Fleming Kelly, Esq.,* and *Erwin Boehning, Esq.,* for the petitioner.

*Gene W. Reardon, Esq.,* and *Frank C. Conley, Esq.,* for the respondent.

TIETJENS, *Judge:* Claims for excess profits tax relief under section 722 of the Internal Revenue Code of 1939, for the year 1941, the fractional year ended July 31, 1942, and the fiscal years ended July 31, 1943, 1944, 1945, and 1946, have been denied by the Commissioner. The petitioner claims relief under section 722 (b) (2) for a depression of its business due to an unusual temporary economic circumstance and under section 722 (b) (1) for an interruption in production due to a strike.

This case was heard by a commissioner of this Court.   His proposed findings are adopted as our findings of fact and are incorporated herein by this reference.   They are stated here to the extent considered necessary together with other findings we have made.

## FINDINGS OF FACT.

The petitioner is a Colorado corporation, incorporated in 1914, with its principal office in Denver, Colorado. The petitioner's tax returns for the taxable years involved were filed with the collector of internal revenue for the district of Colorado.

For many years prior to and during the base period years and the taxable years involved herein, the petitioner was engaged continuously in the wholesale baking business. Petitioner's principal product was bread of various sizes and kinds, but it also baked rolls and related bread products. Petitioner's bakery products were sold only at wholesale prices to various retail grocery stores in the city of Denver and surrounding market area. Petitioner did not bake cakes, but purchased them for sale to its bread customers in promoting bread sales.

Prior to, during, and subsequent to the base period years, two large chain store organizations, namely, Safeway Stores, Inc. (hereinafter referred to as Safeway), and Miller's Groceteria Stores (hereinafter referred to as Miller), operated retail grocery stores in and around Denver in direct competition with each other and with numerous independent retail grocery stores. During all of those years Safeway and Miller, respectively, operated their own or controlled bakery, which supplied bread products for sale at retail only in their respective grocery stores. During this period Safeway and Miller also purchased from petitioner and other wholesale bakers, bread products which were retailed at the same prices for which such bread products were generally sold by the independent grocery stores in the Denver area.

Normally the retail price of bread sold by retail grocery customers of petitioner was higher than the retail price of bread baked in the Safeway and Miller bakeries. The normal or customary differential in such prices was 1 to 2 cents a loaf, but would be greater than that when Safeway or Miller offered weekend specials on their own bread or sold it as a "loss leader."

Prior to and during the entire base period and the subsequent taxable years, the bread industry was a highly competitive operation. During all those years the same five companies, namely, Campbell-Sell Baking Co., Rainbo Bread Co., Macklem Baking Co., Kilpatrick Baking Co., and the petitioner, were the only large wholesale bread bakers serving the independent retail grocers in the Denver area. Throughout the base period and subsequent years these five wholesale bakers engaged in keen competition with each other and also their bread products were sold by retailers in competition with the cheaper priced bread baked for and sold only in Safeway and Miller stores, but none of these companies was forced to discontinue operations due to any form of competition.

The keen competition among the Denver area wholesale bakers resulted in fluctuations, from time to time, in the selling price of their bread products. The petitioner customarily maintained its wholesale price levels, but in effect increased or decreased prices in the form of changes in the scaling weight of its loaves of bread. The normal competitive weight changes varied from a fraction of 1 ounce to 2 ounces a loaf. The normal size of the petitioner's loaf of bread fluctuated between 19¾ and 22 ounces.

In the petitioner's experience it generally requires 17½ ounces of dough to bake out to 16 ounces of baked bread. The principal ingredient of bread is flour. A 196-pound barrel of flour will produce approximately 300 pounds of baked bread. During the base period years, the monthly average price per barrel of hard patent flour, as quoted in the "Commercial and Financial Chronicle," was $6.38 for 1936, $6.42 for 1937, $5.04 for 1938, and $5.29 for 1939.

During the base period years there was no price war between Safeway and Miller or between these and the independent grocery stores in the Denver area. In the fall of 1938 and continuing until late in 1939, Safeway and Miller engaged in extra keen competition for retail grocery business and offered weekend specials and other special sales on various grocery items. In connection therewith and as an inducement to attract customers, Safeway and Miller lowered the retail prices on bread baked in their respectively owned or controlled bakeries. Such price reductions resulted in a substantial increase over what theretofore had been a normal differential between the prices on Safeway and Miller baked bread and the retail prices for bread baked by petitioner and other wholesale bakers. The Safeway and Miller bread price reductions were put into effect about the end of August or the first part of September 1938, and continued in effect for the remainder of 1938 and until early in October 1939. During that time Safeway and Miller baked bread was sold at retail as low as 6 cents for a 16-ounce loaf and 9 cents for a 24-ounce loaf.

The above-mentioned competition between Safeway and Miller caused a shift in patronage away from the independent grocery stores in the Denver area, not only as to bread but other grocery items. Customers initially attracted to Safeway or Miller stores by low bread prices would also buy most of their other groceries at the same store. The independent retail grocers, acting individually and collectively through their associations, put pressure on petitioner and the other Denver wholesale bakers to reduce the prices on their bread products so as to help the grocers meet the competitive situation created by the chain stores. The Denver wholesale bakers refused to make direct bread price reductions, but due to continued pressure upon them one after another made indirect price reductions by increasing the weight per loaf while retaining their wholesale price levels.

Due to the above-mentioned pressure from the independent grocers and the course of action taken by the Denver wholesale bakers, the petitioner maintained its wholesale price of 8 cents per loaf for its standard large loaf, but increased the weight (from about 20½ ounces) to 25 ounces in October 1938, and to 28 ounces in January 1939, which weight continued in effect until reduced to 27½ ounces in September 1939. In October 1939, the weight of petitioner's standard large loaf was reduced to 22 ounces, which approximated the previous normal weight and marked the termination of the period of extraordinary competition between the chain stores and the independent grocery stores. The petitioner's increases in the weight of bread per loaf above normal during the period from October 1938 to October 1939, which were made without regard to the normal fluctuations in the cost of flour, were unusual in the petitioner's experience both as to the amount of the weight adjustments and the duration thereof.

The following table shows, for the base period years 1936 to 1939, inclusive, the comparative number of pounds of bread baked by the petitioner and the condensed profit and loss statement of the petitioner:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Pounds of bread | 8, 396, 934 | 9, 448, 986 | 8, 901, 783 | 10, 791, 499 |
| Bread net sales | $539, 975 | $629, 804 | $559, 099 | $536, 187 |
| Material costs | $219, 467 | $250, 309 | $176, 250 | $186, 250 |
| Bread shop expense | 103, 449 | 124, 452 | 125, 676 | 139, 352 |
| Selling and delivery expense | 144, 604 | 179, 341 | 186, 638 | 189, 605 |
| Administrative expense | 51, 247 | 56, 986 | 64, 845 | 70, 567 |
| Total operating expense | $518, 767 | $611, 088 | $553, 409 | $585, 774 |
| Operating profit (or loss) | $21, 208 | $18, 716 | $5, 690 | ($49, 587) |
| Other income, cake sales | 14, 909 | 6, 010 | 6, 144 | 10, 204 |
| Net profit (or loss) | $36, 117 | $24, 726 | $11, 834 | ($39, 383) |

The decrease in pounds of bread baked in 1938 was due partly to a strike (see *infra*) in the fall of that year. The increase in pounds of bread baked in 1939 was due largely to the unusual increase in the weight per loaf during the period of the extraordinary chain and independent grocery store competition. The decrease in bread material cost in 1938 and 1939 was due mainly to the decrease in the cost per barrel of flour in those years as compared with 1936 and 1937. The increase in selling and delivery expense and administrative expense during 1938 and 1939 was due partly to the managerial decision to eliminate the independent "bobtailers," salesmen who purchased petitioner's products at wholesale for resale to their own customers in outlying territories and substituting company owned routes operated by employee-salesmen on a salary basis, and further, in connection therewith the petitioner's decision to sell its own delivery equipment and to rent such equipment.

In addition to petitioner's regular accounting records, kept on the basis of 4-week periods with 13 such periods in each year, the petitioner maintained records of sales, costs, etc., and profit or loss expressed in dollar amounts per 100 pounds (cwt.) of baked bread. Such statistics are commonly used in the wholesale baking industry to portray the operations of the business. In the experience of petitioner such statistics showed that as compared with 1937 (a year not affected by strike or unusual increased weight per loaf), the decrease in profits for 1938 and the loss for 1939 were due primarily to the extent to which the decline in net sales per cwt. of bread exceeded the decline in total operating expenses per cwt. of bread. The following table shows for the base period years 1936 to 1939, inclusive, the above-mentioned statistics per 100 pounds of bread baked by petitioner in those years:

| | Per 100 pounds of baked bread | | | |
| --- | --- | --- | --- | --- |
| | 1936 | 1937 | 1938 | 1939 |
| Bread net sales | $6.43 | $6.67 | $6.28 | $4.97 |
| Material costs | $2.61 | $2.65 | $1.98 | $1.73 |
| Bread shop expense | 1.24 | 1.32 | 1.41 | 1.29 |
| Selling and delivery expense | 1.72 | 1.90 | 2.10 | 1.76 |
| Administrative expense | 0.61 | 0.60 | 0.73 | 0.65 |
| Total operating expense | $6.18 | $6.47 | $6.22 | $5.43 |
| Operating profit (or loss) | $0.25 | $0.20 | $0.06 | ($0.46) |
| Other income, cake sales | 0.18 | 0.06 | 0.07 | 0.10 |
| Net profit (or loss) | $0.43 | $0.26 | $0.13 | ($0.36) |

During the period from about September 29, 1938, to about October 18, 1938, the employees of the petitioner and also of all other Denver independent wholesale bakers were on strike for a period of approximately 14 or 15 working days, during which practically all business of the petitioner ceased. This was the only strike experienced by petitioner from 1934 through 1945.

The petitioner's average base period net income, computed without the benefit of section 722, for the taxable years in question is as follows:

| | Taxable year ended— | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Dec. 31, 1941 | July 31, 1942 | July 31, 1943 | July 31, 1944 | July 31, 1945 | July 31, 1946 |
| Excess profits net income: | | | | | | |
| 1936 | $35,164.61 | $34,939.61 | $34,939.61 | $34,959.72 | $34,959.72 | $34,959.72 |
| 1937 | 28,590.52 | 28,590.52 | 28,590.52 | 28,590.52 | 28,590.52 | 28,590.52 |
| 1938 | 11,268.20 | 11,254.23 | 11,254.23 | 11,254.23 | 11,254.23 | 11,254.23 |
| 1939 | (34,527.71) | (34,527.71) | (34,527.71) | (34,527.71) | (34,527.71) | (34,527.71) |
| General average | $10,123.90 | $10,064.16 | $10,064.16 | $10,069.19 | $10,069.19 | $10,069.19 |
| Increases: Eliminating loss year | $8,631.93 | | | | | |
| Sec. 711 (b) (1) (J) repairs abnormal in amount | | | $2,166.82 | $933.39 | $1,760.01 | $2,166.82 |
| | | | 13,305.95 | 13,307.21 | 13,307.21 | 13,307.21 |
| Sec. 713 (e) 75 per cent rule | | $13,305.95 | | | | |
| ABPNI | 18,755.83 | 23,370.11 | 25,536.93 | 24,309.79 | 25,136.41 | 25,543.22 |

The petitioner's business was not depressed in the base period because of temporary economic circumstances unusual in the case of the petitioner within the meaning of section 722 (b) (2).

The petitioner is not entitled to excess profits tax relief under section 722 (b) (1).

### OPINION.

The question in this case is whether the Commissioner erred in disallowing the petitioner's application for excess profits tax relief under section 722 of the Internal Revenue Code of 1939. The benefits of section 722 are available to the petitioner only if it establishes that the excess profits tax complained of is "excessive and discriminatory," as those terms are defined in the statute, and further establishes what would be a fair and just standard of normal earnings for the base period.

The petitioner's first contention is that its business was depressed in the base period because of temporary economic circumstances unusual to it and therefore it is entitled to relief under section 722 (b) (2).

The petitioner argues that the temporary economic events unusual to it consisted of an unusual combination of events which occurred in the latter part of 1938 and continued until October 1939, as follows: The two major grocery chains in Denver, which operated their own bakeries, used bread as a "loss leader" and engaged in extra keen competition between themselves and with independent retail grocers; this caused the independent retail grocers to lose patronage so that they exerted pressure on the wholesale bakers to reduce the price of their bread; and eventually the wholesale bakers, including the petitioner, succumbed to the pressure and indirectly reduced their prices by increasing the size of their standard loaf of bread.

The petitioner concedes that section 722 relief is not given in those cases where earnings are depressed because of competition. However, it argues that this is not a case where the chain groceries or the other wholesale bakeries were trying to force the petitioner out of business. Here, the petitioner says, its sole commodity was being used as a weapon in an *external "price war" in which it was not engaged*. The petitioner cites *Southern California Edison Co.*, 19 T. C. 935 (1953), *Ainsworth Manufacturing Corporation*, 23 T. C. 372 (1954), and *Boonton Molding Co.*, 24 T. C. 1065 (1955), for the proposition that relief under section 722 (b) (2) may be given in those situations where some external event occurs which affects either directly or indirectly the customers of the taxpayer so that the latter's profits are reduced because either his customers are lost or he incurs extra expenses in order to keep his customers. The petitioner argues that it comes within the rule of these cases since its independent retail grocer customers were in danger of being forced out of business and

in order to save them the petitioner had to sell its product at a loss; further, that this was unique in its history, that it was temporary in its effect, and that it was not part of a concentrated effort by the chain stores to get rid of the wholesale bakers, nor of competition between the wholesale bakers themselves.

We do not agree with the petitioner. Its argument that its sole commodity was being used as a weapon in an external "price war" in which it was not engaged is without merit. The chain stores used bread as a "loss leader" for two reasons: To capture the retail bread market and at the same time to take business away from the independent retail grocers. The pressure applied by the independent retail grocers was a strong factor in causing the petitioner to increase the size of its standard loaf of bread. However, the petitioner is not an eleemosynary corporation and its reasons for increasing the size of its bread loaf are not limited, as the petitioner contends, to saving its retail grocer customers from going out of business. The petitioner was aware of the fact that its sales would fall off sharply if it did not meet the competition forced upon it. Therefore, as stated in its application for relief under section 722, the petitioner as a matter of self preservation met the price reductions. We think that, in substance, the petitioner was simply engaged in severe competition with firms in its own field and with the bread baked by the chain store bakeries and sold in their stores. Competition is present in almost every business. It is of the very essence of our capitalistic system. *Lamar Creamery Co.*, 8 T. C. 928 (1947). Relief under section 722 (b) (2) cannot be given for depressed earnings caused by competition. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220 (1945); *Lamar Creamery Co.*, *supra; Winter Paper Stock Co.*, 14 T. C. 1312 (1950). That the competition was severe does not change the result. *Permold Co.*, 21 T. C. 759 (1954). See also *Harlan Bourbon & Wine Co.*, 14 T. C. 97 (1950). Swain, petitioner's manager during the taxable years, testified that keen competition and a small margin of profit existed in the wholesale bread industry in Denver. We note that although the competition from October 1938 to October 1939 was the most severe competition ever encountered by the petitioner and other bakeries in Denver, none of them was forced out of business by it. This indicates that the severe competition was not temporary and unusual within the meaning of section 722 (b) (2). See *Blaisdell Pencil Co.*, 16 T. C. 1469 (1951). And that petitioner determined to meet the competition by increasing the size of its loaves rather than by reducing prices was the result of the exercise of managerial judgment and does not change the result.

The three cases cited by the petitioner above are clearly distinguishable. In *Southern California Edison Co., supra*, the taxpayer, who sold electric power, lost three large cities as customers in 1937 when they decided to buy their power from Boulder Dam. The loss occasioned by the shift of the three cities to Boulder power was not recouped until 1939. In *Ainsworth Manufacturing Corporation, supra*, the taxpayer's two largest customers discontinued purchasing certain of its products in 1937 and 1938 which resulted in a depression of the taxpayer's business until different products were developed. In *Boonton Molding Co., supra*, the taxpayer's business was depressed by reason of a merger of its largest customer, who was also its contractual sole outlet for plastic closures, and the subsequent lessening of interest on the part of the merged corporation in selling the taxpayer's plastic closures. In each of the above cases we held that the depression in business caused by the loss of large customers were temporary economic circumstances unusual to the taxpayer, thus qualifying them for relief under section 722 (b) (2).

Here there is no evidence that the use of bread as a "loss leader" by the chain stores caused the loss of any of petitioner's large customers. Any loss of customers by the petitioner was due to the severe competition in which it was engaged, which competition we have held was not a temporary economic circumstance unusual to it within the meaning of section 722 (b) (2).

We hold, therefore, that it was correct for the Commissioner to refuse the petitioner's claim for relief under section 722 (b) (2).

The petitioner's second contention is that in 1938 its normal production, output, or operation was interrupted or diminished because of a strike which was unusual and peculiar in its experience and therefore it is entitled to relief under section 722 (b) (1). The petitioner submitted a computation showing that its earnings for 1938 were depressed in the amount of at least $6,670.90 due to the strike and contends that this amount should be added to its actual earnings for that year in computing its constructive average base period net income.

Assuming that the strike qualifies the petitioner under section 722 (b) (1), nevertheless it is not entitled to any relief thereunder since the credit computed by the Commissioner under section 713 (e) (1), *Stimson Mill Co.*, 7 T. C. 1065, affd. 163 F. 2d 269, certiorari denied 332 U. S. 824, exceeds the credit to which the petitioner might be entitled under section 722 (b) (1) because of the strike factor.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*