HENRY GLASS & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39257. Filed September 15, 1960.

*J. Nathan Helfat, Esq.,* and *Bernard A. Helfat, Esq.,* for the petitioner.

*Martin D. Cohen, Esq., Jules W. Breslow, Esq.,* and *Victor H. Frank, Jr., Esq.,* for the respondent.

KERN, *Judge:* The petitioner contests the respondent's disallowance of its timely filed applications for relief under section 722 of the Internal Revenue Code of 1939 and related claims for refund of excess profits taxes for the fiscal years ended June 30, 1941 to 1946, inclusive. Petitioner also claims benefit of a carryover credit from the fiscal year 1940.

The questions presented for decision are whether the petitioner has established the existence of qualifying factors for relief under section 722(b)(1), (b)(4), and (b)(5), and, if so, whether the petitioner has established a fair and just amount representing normal earnings to be used as a constructive average base period net income under section 722(a). Petitioner has abandoned its claimed qualification for relief under section 722 (b)(2) and (b)(3)(A).

### FINDINGS OF FACT.

Some of the facts have been stipulated by the parties. The stipulation and exhibits thereto attached are incorporated herein by this reference.

The petitioner is a New York corporation organized in June 1904, and since that time it has maintained its principal office and place of business in the city and State of New York. Petitioner maintained its books of account and filed its tax returns on the accrual basis and for the fiscal year ending June 30. Its income and excess profits tax returns for the taxable year 1941 were filed with the then collector of internal revenue for the second district of New York, and its returns for all subsequent taxable years involved herein were filed with the then collector of internal revenue for the third district of New York.

For a number of years following its incorporation petitioner was engaged in business primarily as an importer of household linens and some dress linens. Since about the end of the First World War and at all times material here the petitioner has engaged in business primarily as an independent converter of woven fine cotton grey goods into finished piece goods imprinted with various designs and color combinations originated by petitioner. Over a long period of years petitioner's "Peter Pan" trademark printed on the selvage edge of all of its piece goods was generally accepted in the piece goods trade as a guaranty of new styles in high-quality fast-color goods. The petitioner's piece goods, usually in 120-yard lengths, were sold principally to manufacturers of the higher priced lines of ladies' and children's apparel, dresses, skirts, sports clothes, and swimsuits. Petitioner also made sales to wholesalers of piece goods and in some instances direct to retail yard goods stores and department stores.

At all times material here petitioner was one of a comparatively small group of cotton converters known in the trade as "originators of designs" or "style leaders" in cotton piece goods. Every year and for each season of the year such converters originated new styles in both designs and colors. Each year the petitioner prepared about 125 new designs the creation of which was a very important factor in the petitioner's business. New style and design ideas were developed mainly by petitioner's officers through research, travel, and consultation with leading stylists, many of whom lived abroad. The petitioner's new designs were sent to outside professional designers for execution, that is, the making of scaled water-colored drawings thereof with appropriate spacing so that the designs could be engraved on the copper rollers owned by the finishing plant and used in the printing process.

As an independent converter the petitioner owned no machinery, equipment, or plant facilities for finishing and printing cotton fabrics. At all times material here the petitioner purchased from cotton mills and for its own account the woven fine cotton grey goods which was shipped direct to an independent finisher with whom petitioner

had a contract to do the finishing. The finisher had petitioner's designs engraved on copper rollers used in the printing process and carried out petitioner's instructions as to the color combinations and quantities of yardage to be printed. When the finishing work was completed, petitioner received samples which were used by its salesmen when calling upon old customers and prospective new customers.

Prior to and during the base period years the petitioner's business was competitive, particularly with a small group of independent converters known as "style leaders" who "sold fashion by the yard." During that period a large group of converters consisted of integrated concerns which operated their own plant facilities. Several of these integrated converters produced some lines of fine cotton piece goods which, even though not complete style lines, were competitive with petitioner's cotton piece goods in both quality and price. The bulk of the integrated converters generally produced coarser cotton piece goods for use in lower price lines of wearing apparel, made fewer changes in designs, and sold at lower prices than the petitioner. While such goods were not in direct competition with petitioner's cotton piece goods in either quality or price, the petitioner could not fix its prices too far out of line with the lower priced piece goods.

During the fiscal years June 30, 1924 to 1940, inclusive, Max Wilner, John Glass, Samuel Silver, Isidor Wilner, Herbert I. Glass, and Ellis H. Wilner owned most of petitioner's outstanding common and preferred stock, and they were the petitioner's officers and directors. At all times material here those men were well known in the cotton fabric piece goods trade and they accounted for about 50 per cent of petitioner's sales every year and also helped petitioner's other salesmen consummate sales. Throughout that period and prior thereto Max Wilner was a principal stockholder and the president of petitioner; Max Wilner and Ellis H. Wilner were in charge of styling and the creation of new designs; and Isidor Wilner, as the converter, supervised the purchase of grey goods and the finishing and printing done by the finishing plants.

The petitioner earned substantial profits each year over a period of 9 years prior to the depression of the early 1930's, and it had an average net income, in round figures, of $243,000 for the 9 fiscal years from June 30, 1923 to 1931, inclusive. For the fiscal years June 30, 1932 to 1937, inclusive, the petitioner had a net loss of $262,116.47 for 1932, a net loss of $81,062.16 for 1933, net income of $180,146.90 for 1934, a net loss of $113,434.99 for 1935, net income of $12,918.85 for 1936, and net income of $116,400.87 for 1937.

After the close of the fiscal year ended June 30, 1937, the petitioner's officers decided that while the profit for that year was fairly

good the volume of sales was considerably below what it should have been under general business conditions. A survey of customers in regard to the demand for petitioner's cotton piece goods revealed that in the manufacture of ladies' and children's wearing apparel there was a definite trend toward an increased use of rayon, an artificial silklike material which differed from cotton in texture, appearance, and feel. Petitioner's officers concluded that competition from rayon piece goods was responsible for a decrease in the demand for petitioner's cotton piece goods. In the latter part of 1937 or early in 1938 petitioner decided that in addition to its principal business of converting cotton grey goods into piece goods it would engage in converting rayon grey goods into piece goods for the purpose of supplying the demands of its customers and also for sale to other users of rayon.

At sometime in 1938 prior to the end of the fiscal year June 30, 1938, petitioner purchased a stock of rayon grey goods for conversion into finished piece goods imprinted with original designs in fast colors. At one time during this period approximately 40 per cent of the inventory was rayon. Petitioner was inexperienced in handling rayon materials and it hired a rayon cloth stylist and two salesmen who specialized in selling rayon piece goods. In general, petitioner's method of handling rayon cloth was the same as for cotton cloth, that is, the rayon grey goods were purchased from the mill for petitioner's own account and shipped to the finisher which carried out petitioner's instructions as to designs, color combinations, and quantities of finished rayon piece goods. Petitioner used the same finisher for both rayon and cotton. In the fiscal year ended June 30, 1938, petitioner started converting rayon as a supplemental line, but throughout the fiscal year June 30, 1938, petitioner continued doing business primarily as a converter of fine cotton goods. The net sales of petitioner fell off from $2,631,809.25 for fiscal 1937 to $1,899,753.45 for fiscal 1938, and it sustained a net loss of $152,505.84 for the latter year.

Sometime around the end of the calendar year 1938 petitioner's rayon piece goods venture proved to be a failure. Petitioner found that its competitors were quickly getting better prices at the mills for rayon grey goods, were copying petitioner's designs, and were using less expensive finishing methods, with the result that petitioner's rayon piece goods were not competitive pricewise.

In December 1938 or January 1939 the stockholders decided that petitioner's rayon venture should be terminated. Further, and because of the combined effect on petitioner's business resulting from the failure of the rayon venture, the substantial net loss for the fiscal year June 30, 1938, and the decline in the demand for petitioner's

cotton piece goods as a result of competition with rayon, the petitioner's president and principal stockholder, Max Wilner, proposed that the petitioner liquidate and go out of business. Beginning early in 1939 petitioner initiated a program leading to a substantial reduction in its inventory of goods on hand at June 30, 1939. Petitioner kept its contracts with finishers. Petitioner continued sales of its finished cotton goods to customers at more or less its usual markup during most of fiscal 1939. With respect to its contracts with mills for grey goods, petitioner was able to negotiate cancellation of some contracts where the cloth had not been woven but generally petitioner had to accept the grey goods contracted for and then sell the goods in the grey state, usually at a loss. For the fiscal year ended June 30, 1939, petitioner's purchases amounted to $698,087.83 as compared with purchases in excess of a million dollars for each of the 2 preceding years. For fiscal 1939 petitioner's opening inventory amounted to $622,808.75, which was comparable to the 2 prior years, and the closing inventory had been reduced to $209,332.79. Petitioner's net sales declined from $1,899,753.45 for fiscal 1938 to $1,804,622.59 for fiscal 1939, and for the latter year petitioner sustained a net loss of $241,733.73.

Early in 1939 when it became known in the piece goods trade that petitioner was liquidating its inventory and was not making advance preparations for a full line of new styles, some customers urged that petitioner continue in the cotton piece goods business. In May 1939 all of petitioner's stockholders agreed to Samuel Silver's proposal that petitioner concentrate on the cotton piece goods business during the next 2 months with a reduced staff of employees and a drastic cut in officers' salaries, as an experiment to determine whether the business could operate profitably. As of June 1, 1939, there was a reduction from 56 to 38 in the number of employees, and a reduction of approximately one-third in the total amount of officers' salaries. As a result of the experiment all of petitioner's stockholders agreed in July 1939 that they would not liquidate the business and that they would continue the petitioner's cotton piece goods business in the same manner as previously conducted prior to the introduction of rayon, but on the basis of the then reduced scale of operation. At or about the same time the stockholders further agreed to reduce the capitalization of petitioner and requested counsel to work out the details.

Pursuant to agreements between stockholders, corporate resolutions, and a certificate of reduction of capital stock filed with the secretary of state and county clerk, all before December 31, 1939, the petitioner's authorized capital stock was reduced from $680,000

(represented by 4,300 shares of $100 par preferred and 2,500 shares of $100 par common) to $319,000 (represented by 3,150 shares of $100 par preferred and 4,000 shares of $1 par common) and certain old shares were eliminated and new shares were issued to the same stockholders as agreed between themselves.

Throughout the fiscal year ended June 30, 1940, the petitioner continued its business primarily as an independent converter of cotton grey goods into finished piece goods, but on a smaller scale of operations than for previous years. During the first part of that fiscal year the petitioner did not have a complete new line of styles or designs which had not been prepared in advance for the fall season and which normally required at least 20 weeks' time. At the beginning of fiscal 1940 petitioner's inventory was at a low figure of only $209,332.79 consisting of $183,651.52 finished goods and $25,681.27 grey goods, and petitioner's grey goods purchases were normally delivered at a rate of only about 10 per cent weekly. For fiscal 1940 petitioner's purchases amounted to $571,444.50 which was substantially less than for the previous year and petitioner's net sales further declined to $1,124,396.28. For fiscal 1940 petitioner had net income of $11,838.45 as compared to its substantial net loss for the previous year. War factors did not affect or influence the petitioner's business operations or earnings during any portion of its fiscal year ended June 30, 1940.

Joint Exhibit 17–Q, attached to the stipulation, consists of statements regularly maintained by petitioner, over a period of years, showing profit and loss from its operations on a monthly basis, but without yearend adjustments so that the data contained therein as to yearly totals does not reconcile in all respects with totals shown on petitioner's tax returns nor with certain stipulated yearly totals. Those records disclose, *inter alia*, income from "cottons" (that is, sales less discount and cost) for every month during the fiscal years ended June 30, 1937 and 1938. Those records further disclose, in a similar manner, income from "cottons and rayons" for every month during the fiscal years ended June 30, 1939 and 1940, except for the month of June in each year for which the records are not available. For the fiscal years 1939 and 1940 those records show no breakdown of sales as between cotton goods and rayon goods or finished goods and grey goods. For every month except June during the fiscal year 1940 those records show "cotton and rayon purchases" without any breakdown of the cost as between cotton and rayon.

During the petitioner's 4 base period fiscal years ended June 30, 1937 to 1940, inclusive, the percentage of petitioner's gross profit to

sales or markup for each month, as derived from the above-mentioned Joint Exhibit 17–Q and agreed to by the parties, was as follows:

| Month | Fiscal year ended June 30— | | | |
|---|---|---|---|---|
| | 1937 | 1938 | 1939 | -1940 |
| July | 16. 87 | 16. 58 | 15. 35 | 16. 35 |
| August | 16. 78 | 18. 10 | 18. 14 | 18. 51 |
| September | 16. 94 | 16. 27 | 16. 05 | 21. 12 |
| October | 18. 68 | 15. 30 | 13. 39 | 19. 77 |
| November | 19. 81 | 13. 35 | 10. 63 | 20. 43 |
| December | 28. 37 | 14. 29 | 14. 04 | 20. 90 |
| January | 19. 23 | 14. 72 | 17. 52 | 21. 00 |
| February | 19. 13 | 8. 73 | 16. 27 | 22. 33 |
| March | 20. 58 | 10. 53 | 14. 50 | 21. 47 |
| April | 20. 16 | 11. 70 | 8. 62 | 20. 32 |
| Mya | 16. 88 | 11. 77 | 4. 30 | 18. 63 |
| June | 12. 60 | 4. 48 | (¹) | (¹) |

¹ Not available.

The petitioner's profit and loss statements per its Federal income tax returns as adjusted by revenue agents' reports, and also its excess profits net income for the base period fiscal years ended June 30, 1937 to 1940, inclusive, are as follows:

| | Fiscal year ended June 30— | | | |
|---|---|---|---|---|
| | 1937 | 1938 | 1939 | 1940 |
| Sales | $2,631,809.25 | $1,899,753.45 | $1,804,622.59 | $1,124,396.28 |
| Cost of goods sold: | | | | |
| Inventory—beginning | 656,634.75 | 666,516.12 | 622,808.75 | 209,332.79 |
| Purchases | 1,381,029.40 | 1,070,366.65 | 698,087.83 | 571,444.50 |
| Other costs | 694,416.68 | 566,356.63 | 543,226.33 | 321,789.35 |
| Total | 2,732,080.83 | 2,303,239.40 | 1,864,122.91 | 1,102,566.64 |
| Inventory—end | 666,516.12 | 622,808.75 | 209,332.79 | 213,790.75 |
| Cost of goods sold | 2,065,564.71 | 1,680,430.65 | 1,654,790.12 | 888,775.89 |
| Gross profit | 566,244.54 | 219,322.80 | 149,832.47 | 235,620.39 |
| Other income | 4,045.64 | 24,174.59 | 5,102.40 | 6,580.99 |
| Total income | 570,290.18 | 243,497.39 | 154,934.87 | 242,201.38 |
| Deductions: | | | | |
| Compensation of officers | 86,615.20 | 72,900.00 | 71,100.00 | 51,000.00 |
| Salaries and wages | 92,361.78 | 83,630.69 | 71,724.66 | 59,886.88 |
| Rent | 17,419.92 | 17,289.92 | 16,536.62 | 15,000.00 |
| Bad debts | 6,000.00 | | | 3,800.00 |
| Interest | 7,560.05 | 10,512.79 | 7,103.85 | 4,894.51 |
| Taxes | 8,691.42 | 13,980.15 | 10,888.22 | 6,647.22 |
| Contributions | 2,173.70 | | | 623.08 |
| Depreciation | 1,202.00 | 1,232.03 | 1,145.15 | 957.00 |
| Repairs | | | 3,077.98 | |
| Other deductions | 231,865.24 | 196,457.65 | 215,092.12 | 87,554.24 |
| Total deductions | 453,889.31 | 396,003.23 | 396,668.60 | 230,362.93 |
| Net income | 116,400.87 | (152,505.84) | (241,733.73) | 11,838.45 |
| Less: | | | | |
| Capital gain | 128.50 | 170.00 | | 550.00 |
| Dividends received | 2,791.20 | 2,858.60 | 2,881.00 | 2,802.60 |
| Excess profits net income | 113,481.17 | (155,534.44) | (244,614.73) | 8,485.85 |

The petitioner's balance sheets in summarized form per its Federal income tax return for each of the fiscal years ended June 30, 1923 to 1940, inclusive, are set forth in Joint Exhibit 14–N attached to the stipulation. Those balance sheets for the base period fiscal years ended June 30, 1937 to 1940, inclusive, are as follows:

| | Balance sheets as of June 30— | | | |
| --- | --- | --- | --- | --- |
| | 1937 | 1938 | 1939 | 1940 |
| *Assets* | | | | |
| Cash | $90,766.40 | $107,858.24 | $108,427.64 | $43,106.98 |
| Accounts receivable (net) | 375,897.25 | 259,935.74 | 277,361.28 | 168,301.27 |
| Inventories | 666,516.12 | 622,808.75 | 209,332.79 | 213,790.75 |
| Investments | 91,037.50 | 62,596.30 | 62,069.30 | 58,007.30 |
| Capital assets (net) | 6,680.68 | 5,522.96 | 10,807.06 | 9,850.06 |
| Other assets (deferred charges, advances to employees, etc.) | 144,080.31 | 173,525.64 | 181,743.43 | 7,094.39 |
| Total assets | 1,374,978.26 | 1,232,247.63 | 849,741.50 | 500,150.75 |
| *Liabilities* | | | | |
| Notes payable | 350,000.00 | 400,000.00 | 335,000.00 | 150,000.00 |
| Accounts payable | 36,316.95 | 78,265.58 | 23,302.83 | 18,891.04 |
| Accrued expenses | 26,943.77 | 1,578.40 | 2,088.29 | 7,169.31 |
| Total liabilities | 413,260.72 | 479,843.98 | 360,391.12 | 176,060.35 |
| *Net worth* | | | | |
| Capital stock | 561,000.00 | 561,000.00 | 561,000.00 | 319,000.00 |
| Surplus | 400,717.54 | 191,403.65 | (71,649.62) | 5,090.40 |
| Total net worth | 961,717.54 | 752,403.65 | 489,350.38 | 324,090.40 |
| Total liabilities and net worth | 1,374,978.26 | 1,232,247.63 | 849,741.50 | 500,150.75 |

The averages shown on Exhibits 12–L and 13–M are herein set out and for convenience combined in one schedule, as follows:

| | Averages in dollar amounts | | Averages of ratios in terms of per cent to net sales | |
| --- | --- | --- | --- | --- |
| | Fiscal years ended June 30— | | | |
| | 1923–1940 | 1937–1940 | 1923–1940 | 1937–1940 |
| Net sales | $3,837,464.43 | $1,865,145.39 | 100.00 | 100.00 |
| Cost of goods sold | 3,079,081.43 | 1,572,399.34 | 80.24 | 84.30 |
| Gross profit | 758,383.00 | 292,755.05 | 19.76 | 15.70 |
| Total income | 769,890.39 | 302,730.96 | 20.06 | 16.23 |
| Deductions | 677,396.45 | 369,231.02 | 17.65 | 19.80 |
| Net income (or loss) | 92,493.95 | (66,500.06) | 2.41 | (3.57) |
| Excess profits net income (or loss) | 91,658.68 | (69,545.54) | 2.39 | (3.73) |

For the fiscal years 1923 through 1940 petitioner's net sales (omitting cents), percentage of gross profits to net sales, deductions (omitting cents), ratio of deductions to net sales, net income or loss (omitting cents), and ratio of net income or loss to net sales were as follows:

| Fiscal year ended June 30— | Net sales | Per cent gross profit to net sales | Deductions | Ratio of deductions to net sales | Net income (or loss) | Ratio of net income (or loss) to net sales |
|---|---|---|---|---|---|---|
| 1923 | $4,713,841 | 20.75 | $775,917 | 16.46 | $216,096 | 4.58 |
| 1924 | 5,935,690 | 18.87 | 931,094 | 15.69 | 205,125 | 3.46 |
| 1925 | 5,377,464 | 20.06 | 857,921 | 15.95 | 233,960 | 4.35 |
| 1926 | 6,003,810 | 20.05 | 936,329 | 15.60 | 283,510 | 4.72 |
| 1927 | 6,358,805 | 21.97 | 1,074,881 | 16.90 | 353,507 | 5.56 |
| 1928 | 5,187,345 | 23.98 | 946,889 | 18.25 | 301,732 | 5.82 |
| 1929 | 5,830,903 | 23.22 | 1,061,777 | 18.21 | 303,311 | 5.20 |
| 1930 | 4,779,947 | 22.49 | 879,114 | 18.39 | 212,290 | 4.44 |
| 1931 | 4,754,123 | 18.26 | 794,578 | 16.71 | 84,904 | 1.79 |
| 1932 | 2,714,933 | 12.04 | 599,407 | 22.08 | (262,116) | (9.65) |
| 1933 | 2,030,842 | 17.75 | 449,024 | 22.11 | (81,062) | (3.99) |
| 1934 | 3,194,767 | 21.66 | 516,837 | 16.18 | 180,146 | 5.64 |
| 1935 | 2,441,219 | 14.10 | 463,768 | 19.00 | (113,434) | (4.65) |
| 1936 | 2,290,081 | 19.11 | 428,670 | 18.72 | 12,918 | .56 |
| 1937 | 2,631,809 | 21.52 | 453,889 | 17.25 | 116,400 | 4.42 |
| 1938 | 1,899,753 | 11.54 | 396,003 | 20.84 | (152,505) | (8.03) |
| 1939 | 1,804,622 | 8.30 | 396,668 | 21.98 | (241,733) | (13.39) |
| 1940 | 1,124,396 | 20.96 | 230,362 | 20.49 | 11,838 | 1.05 |

Petitioner's excess profits tax liability as finally determined by respondent without the benefit of section 722, the amount paid thereon by petitioner, and the amount of refund claimed by petitioner for each of the taxable years involved herein are as follows:

| Fiscal year ended June 30— | Excess profits tax liability | Amount paid | Amount of refund claimed |
|---|---|---|---|
| 1941 | $15,001.11 | $15,001.11 | $15,001.11 |
| 1942 | 128,848.17 | 128,848.17 | 115,352.55 |
| 1943 | 166,866.53 | ¹ 135,017.72 | 135,017.72 |
| 1944 | 235,681.50 | ¹ 206,022.23 | 206,022.23 |
| 1945 | 43,264.81 | 43,264.81 | 43,723.27 |
| 1946 | 2,352.30 | 2,352.30 | 2,479.66 |

¹ The difference between the liability and the amount paid, or $31,848.81 for 1943 and $29,659.27 for 1944, represents the amount of deferment under section 710 (a) (5) of the Internal Revenue Code of 1939.

For each of the taxable years involved herein and as determined without the benefit of section 722 the petitioner's excess profits net income, excess profits credit under the invested capital method, specific exemption, and adjusted excess profits net income are as follows:

| Fiscal year ended June 30— | Excess profits net income | Excess profits credit under invested capital method | Specific exemption | Adjusted excess profits net income |
|---|---|---|---|---|
| 1941 | $95,793.48 | $37,933.17 | $5,000 | $52,860.31 |
| 1942 | 328,637.07 | 51,185.86 | 5,000 | 272,451.21 |
| 1943 | 239,021.20 | 48,613.94 | 5,000 | 185,407.26 |
| 1944 | 321,231.21 | 45,494.02 | { 5,000 / 10,000 | ¹ 270,737.19 / ² 265,737.19 |
| 1945 | 109,024.73 | 48,422.61 | 10,000 | 50,602.12 |
| 1946 | 56,936.54 | 41,478.94 | 10,000 | 5,457.60 |

¹ Computed under law applicable to 1943.
² Computed under law applicable to 1944.

OPINION.

The petitioner contests the respondent's disallowance of its applications for relief, under section 722 (a), (b) (1), (b) (4), and (b) (5) of the Internal Revenue Code of 1939,[1] from excess profits taxes as determined by respondent for the fiscal years ended June 30, 1941 to 1946, inclusive. Petitioner also claims the benefit of any carryover of unused excess profits credit from the fiscal year ended June 30, 1940.

The petitioner is entitled to use the excess profits credit based on income pursuant to section 713 or based on invested capital pursuant to section 714 of the Internal Revenue Code of 1939, whichever results in the lesser excess profits tax. The credit allowed in respondent's determination is based on invested capital. The petitioner contends that in lieu of such credit and under the benefit of section 722 it is entitled to an excess profits credit based on a constructive average base period net income of $100,000.

The petitioner has the burden of proof that it comes within the requirements prescribed by section 722. The petitioner must (1) establish that the tax computed without the benefit of section 722

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer.

    *     *     *     *     *     *     *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

results in an excessive and discriminatory tax in that its average base period net income is an inadequate standard of normal earnings because of an event of the type embraced within subsection (b) as a qualifying factor, (2) establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income (CABPNI) in lieu of its average base period net income (ABPNI) otherwise determined, and (3) establish that this CABPNI would result in an excess profits tax credit in excess of that allowed under the provisions of section 714. See sec. 712 (a); *Clayton Coal Co.*, 27 T.C. 810, 819, 820; *Old Homestead Bread Co.*, 28 T.C. 306, 313.

The respondent contends that on the record herein the petitioner has failed to show a qualifying event under either subsection (b) (1), (b) (4), or (b) (5) and, even if so, it has failed to show any reasonable method of reconstruction resulting in a CABPNI which would produce an excess profits credit in excess of that to which petitioner is entitled under the provisions of section 714.

The petitioner's claim for section 722 relief, mainly under (b) (4) and in the alternative under (b) (1) or (b) (5), is based on the same factual circumstances. A brief summary of the salient facts is as follows: Prior to the base period years ended June 30, 1937 to 1940, inclusive, the petitioner was engaged primarily in the competitive business of an independent converter of fine cotton grey goods into piece goods imprinted with fast colors according to petitioner's original styles or designs. Petitioner owned no machinery, equipment, or plant facilities. During fiscal 1937 competition from rayon, an artificial silklike material, caused a decline in the demand for petitioner's cotton goods. To meet that competition and before the end of fiscal 1938 petitioner purchased rayon grey goods and started converting it into piece goods as a supplemental line. Petitioner's converting operations were essentially the same for both cotton and rayon, the only difference being the type of fabric used. There is only an approximation as to the extent to which petitioner engaged in converting rayon resting on the testimony of one witness to the effect that "maybe as high as 40 percent of our line was rayon." Petitioner's books show sales and purchases of "cotton and rayon." No sales of rayon were made until late in fiscal 1938. In fiscal 1938 petitioner's net sales of cotton piece goods declined substantially from the previous year and it sustained an operating net loss. According to its books petitioner's first substantial sales of rayon were made in July 1938 and by the following December its rayon venture proved to be a failure because of severe competition from other converters of rayon goods. In December 1938 or January 1939 petitioner's stockholders decided that the rayon venture should

be terminated and, further, its principal stockholder proposed the liquidation of petitioner's business. However, there was no definite decision to actually wind up the business. During the remainder of fiscal 1939 petitioner kept its contracts with its finisher, presumably as to both cotton and rayon, and made sales of finished piece goods to its customers. At the same time petitioner initiated a program to reduce its inventory by canceling contracts for grey goods where the fabric had not been woven and selling some goods in its grey state, with the result that its closing inventory for fiscal 1939 was only about one-third of that for the 2 preceding years. Also during the last part of fiscal 1939 petitioner did not prepare a full line of new designs in advance for the next year. For fiscal 1939 petitioner's net sales of cotton and rayon combined declined substantially from the previous year's sales which were, either entirely or primarily, of cotton and it sustained an operating net loss. During June and July 1939 petitioner reduced its staff of employees, cut officers' salaries, and concentrated on the sale of cotton piece goods to determine whether the business could operate profitably. In July 1939 petitioner's stockholders agreed that they would not liquidate the business and would continue converting cotton in the same manner as before but with the elimination of rayon. They also agreed to reduce petitioner's capitalization which was done prior to December 31, 1939. The operation of petitioner's business, primarily as a converter of cotton, was continued during the fiscal year ended June 30, 1940. For fiscal 1940 petitioner's operations were on a greatly reduced scale as compared to previous years and there was a further substantial decline in total net sales, but it showed a small profit for that year.

With respect to its claimed qualification for relief under section 722(b)(4), petitioner's brief states the following:

The *petitioner relies here primarily on these propositions:*

(1) That the reversal by petitioner of a prior decision to liquidate its business, which liquidation was in the process of completion, and a determination in August 1939 in effect to start business over again, eliminating rayon and confining itself to cotton, and the implementation of such determination during the base period, and before December 31, 1939, qualifies petitioner for relief under Section 722(b)(4) as a taxpayer who commenced or changed the character of its business and whose base period income does not reflect the normal operations for the entire base period of its business.

(2) That because the petitioner's inventory was depleted and the petitioner was devoid of a new line of styles and because of other material factors present at the time when it resumed or began operation in August 1939, the business of the petitioner did not reach the earning level at the end of the base period which it would have reached then, if it had commenced business or changed the character of its business two years before it did so, it qualifies under Section 722(b)(4) for a reconstruction on the assumption that it had com-

menced or changed the character of its business two years before it actually did so.

(3) If the petitioner is held not to qualify as having commenced business during the base period, or changed the character of its business by a reversal to discontinue and the determination to resume business, then the petitioner claims it has changed the character of its business by a change in the products or services furnished.

On the record in this proceeding we find it unnecessary to determine whether the base period events, particularly the reversal of a decision to liquidate and the determination to continue solely as a cotton converter with discontinuance of rayon piece goods thereby eliminating the expenses and losses connected therewith, constituted a qualifying factor or qualifying factors for relief under section 722(b)(1), (b)(4), or (b)(5).

Even if we assume that petitioner qualifies for relief as contended, we are unable to find from the record herein a fair and just amount representing normal earnings to be used as a constructive average base period net income (CABPNI) which would afford a credit in a greater amount than the excess profits credit allowed by respondent under the invested capital method. Accordingly, petitioner has failed to meet that aspect of its burden of proof that it comes within the requirements prescribed by section 722.

The petitioner's claimed CABPNI of $100,000 is unsupported by any satisfactory factual basis and rests upon a mere estimate by petitioner's president who impressed us as being much more interested in styling and designing than in business and financial matters. He testified without giving any satisfactory economic reasons that it was his opinion that after application of the 2-year push-back rule to the base period events petitioner's net sales of cotton piece goods "couldn't have been any worse probably than 2½ million dollars" with a profit of "say somewhere around" $125,000 for the last base period fiscal year ended June 30, 1940.

The petitioner's president, who was the only witness to testify on this subject, estimated, under a 2-year push-back, that petitioner's sales of cottons would have fallen off from the previous year and it would have had a net loss of from $10,000 to $20,000 for the fiscal year June 30, 1937–1938; that sales of cottons would be $2,225,000 and profits thereon over $100,000 for the fiscal year June 30, 1938–1939; that sales of cottons would be $2,500,000 and profits thereon $125,000 for the fiscal year June 30, 1939–1940; and that the increased sales for the fiscal years 1939 and 1940 would have brought about increased costs amounting to about 3½ per cent of increased sales for commissions, advertising, etc.

These unsupported and, in our opinion, unrealistic estimates do not give proper consideration to the actual base period experience

of petitioner including the actual reduced scale of its operations in the fiscal year 1940, the competition of integrated converters, and especially the effect of rayon competition.

In its fiscal year 1937 petitioner's officers noted a trend from cotton to rayon which affected its sales of cotton piece goods. There is no showing that this trend did not continue during the base period. Petitioner did not start into the rayon converting business until the latter half of its fiscal year 1938, yet for that year its combined sales of cotton and rayon amounted to only $1,899,753 as compared with $2,631,809 for the prior year. The record does not disclose how much of this constituted cotton sales. In its fiscal year 1940 petitioner concentrated on cotton sales and these sales amounted only to $1,124,396. We recognize that petitioner entered this year with a depleted inventory, no fall line of newly designed goods, and a smaller sales force. However, there is nothing in the record other than the unsupported estimate of petitioner's president which would lead us to believe that sales of cotton goods for that year could have been restored to anywhere near the level of such sales prior to the beginning of rayon competition if the decisions to abandon the conversion of rayon and the reversal of its policy of liquidation had been made 2 years before.

Petitioner, in its argument on this point, lays stress on some words used by respondent's counsel in his opening statement to the effect that petitioner was "a member of the cotton converters" who did better during the base period than in other periods. In the first place this statement is not evidence, nor, in its context, does it constitute an admission. In the second place it is apparent that the industry which respondent's counsel categorizes as "cotton converters" differs from the industry of which petitioner considers itself to be a member. Petitioner contends that its industry was composed of a comparatively small group of cotton converters known in the trade as "originators of designs" or "style leaders" in cotton piece goods printed in fast colors. Respondent's conception of "cotton converters" would include all types of converters including integrated converters producing coarse cotton piece goods printed in nonfast colors according to copied designs. It might also include converters who engaged in the conversion of rayon using cheap finishing methods and copied designs and were the type of converters that were able to undersell petitioner during its participation in the business of converting rayon.

The petitioner's books and records made no segregation as between its cotton piece goods business and its supplemental rayon piece goods business and, accordingly, it is impossible to determine what, if any, increased level of earnings might have resulted from peti-

tioner's discontinuance of rayon thereby achieving a saving of rayon expenses and losses. Cf. *Crowell-Collier Publishing Co.*, 25 T.C. 1268, affd. 259 F. 2d 860, certiorari denied 358 U.S. 928.

On the record before us we are unable to find a constructive average base period net income in an amount which would be greater than the excess profits credit allowed by respondent under the invested capital method. Therefore we conclude and so hold that petitioner is not entitled to relief under section 722 for the taxable fiscal years ended June 30, 1941 to 1946, inclusive, or to the benefit of any carryover from the fiscal year ended June 30, 1940, based on a CABPNI for those years.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*